[Cite as *State v. Conley*, 2018-Ohio-298.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. Patricia A. Delaney, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 17 CAA 03 0018 |
| REGINALD CONLEY | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:       Criminal Appeal from the Court of Common Pleas, Case No. 16 CR I 07 0350


JUDGMENT:       Affirmed


DATE OF JUDGMENT ENTRY:       January 25, 2018


APPEARANCES:

| For Plaintiff-Appellee | For Defendant-Appellant |
|---|---|
| CAROL HAMILTON O'BRIEN | TODD A. WORKMAN |
| PROSECUTING ATTORNEY | WORKMAN LAW FIRM |
| DOUGLAS N. DUMOLT | 35 North Sandusky Street |
| ASSISTANT PROSECUTOR | Delaware, Ohio 43015 |
| 140 N. Sandusky Street, 3rd Floor | |
| Delaware, Ohio 43015 | |

*Wise, J.*

**{¶1}**    Defendant-Appellant Reginald Conley appeals his conviction on two counts of murder entered in the Delaware County Court of Common Pleas following a jury trial.

**{¶2}**    Plaintiff-Appellee is the State of Ohio.

STATEMENT OF THE CASE

**{¶3}**    On July 22, 2016, the Delaware County Ohio Grand Jury returned a joint indictment against Appellant Reginald Conley and co-defendant Jermaine Kelly. The indictment charged Appellant with two counts of Murder; Count One in violation of R.C. §2903.02(A) and Count Two in violation of R.C. §2903.02(B), both unclassified felonies. *Id.* Appellant was further charged with Intimidation of a Witness in violation of R.C. §2921.04(B)(2) and with Having a Weapon Under Disability in violation of R.C. §2923.13(A)(4). Counts One, Two, and Three also carried a Gang Affiliation Specification in violation of R.C. §2941.142 and a Firearm Specification in violation of R.C. §2941.145.

**{¶4}**    Prior to trial, the defendants moved to sever their trials. Following an evidentiary hearing, the motions were denied. The trial court also held an evidentiary hearing on the defendants' motions *in limine* to exclude evidence of Conley's involvement in a double homicide with Gervins. Again, the trial court denied the motions.

**{¶5}**    Both Defendants waived their right to a jury trial as to the gang specifications related to Counts One, Two, and Three, and their right to a jury trial as to their respective having weapons under disability charges. Those charges were tried to the court. The murder and intimidation charges along with the firearm specifications were all tried to a jury, with the trial commencing on March 6, 2017, and continuing through March 7, 8, 9 and 10, 2017.

**{¶6}** At trial, the jury heard the following account of the events that took place on November 9, 2012, which led to the above charges.

**{¶7}** Victoria Hilbrands testified that on November 9, 2012, she lived at 6901 Redbank Rd. in Galena, Ohio. Around 5:30 P.M. she heard a loud banging on the door. T. at 254-255. She could not initially see anyone outside the door. However, she heard a man, later identified as Dontee Gervins, yelling that he had been shot and asking to be let in. T. at 256. Mrs. Hilbrands immediately called 911. T. at 257. That call was placed at 5:43 P.M. T. at 284. While on the phone with 911, Mrs. Hilbrands could hear Gervins on his cell phone. Gervins repeatedly said "I won't tell anybody" to the person with whom he was speaking. T. at 260.

**{¶8}** Gale Dunlap testified that she lived on Gorsuch Rd. This is a short distance from the Hilbrands' residence on Redbank Rd. T. at 346-347. On November 9, 2012, Dunlap was returning home from work sometime after 5:00 P.M. when a vehicle pull out of the Hilbrands driveway. The vehicle exited the driveway in a manner that forced her to brake her vehicle. T. at 350. She described the vehicle as a light blue or gray sedan but could not identify who was driving or how many occupants were in the vehicle. T. at 351. Mrs. Dunlap was behind the vehicle for a short period of time. During this time, the vehicle failed to stop at two stop signs. T. at 353. Around this same time, Mrs. Dunlap saw a squad traveling toward the location where the shooting had occurred. Mrs. Dunlap was unable to positively identify the vehicle, but testified it was consistent with that later found to be used by Reginald Conley. T. at 356.

**{¶9}** Deputy Charm Johnson (also referred to in the record by her maiden name as "Charm Miller") testified that she was the first person to arrive at the Hilbrands'

residence after the shooting. T. at 284-286. She arrived at approximately 5:50 P.M. T. at 299. Dep. Johnson found Gervins laying on the front porch of the Hilbrands' residence. T. at 286. Gervins appeared very weak, indicated he had been shot, but was unable to verbalize his name or other information at that time. T. at 286. Gervins' cellphone was lying next to him on the porch, and Dep. Johnson could hear a female voice on the line. T. at 287. Shortly thereafter Dep. Johnson notified medics that the scene was safe and they could approach to aide Gervins. T. at 288.

{¶10} Brooks Church testified that he was one of the first medics who arrived on the residence. T. at 326. Church described Gervins as scared, very alert, barely able to speak, but could speak a little in between breaths. T. at 328. Church asked Gervins where the shooting occurred. Gervins responded "here" and gestured as if to indicate near the residence. T. at 330. When asked, Gervins indicated that he knew who shot him. T. at 330.

{¶11} Detective Charles Gannon was the first officer to arrive on scene after Deputy Johnson. He testified he became involved in the investigation at 5:42 P.M. on November 9, 2012. T. at 1190. He was on his way home when the 911 call was placed, but he was the closest detective to 6901 Red Bank Rd. T. at 1190. When Det. Gannon arrived at the scene, medics were working on Mr. Gervins and he was still alive. T. at 1194. Shortly after Det. Gannon arrived, Gervins' cellphone began ringing and "Wifey" was displayed as the caller on the screen of the cell phone. T. at 1200. Det. Gannon had a brief conversation with Amber Bland and ended the call to continue his work on the scene. T. at 202-1203. Det. Gannon finished processing the scene and documented what

occurred. T. at 1203-1212. After his work at the scene was completed, he drove to Riverside hospital. T. at 1217.

**{¶12}** At the hospital, Det. Gannon learned that Dontee Gervins had been living with his fiancé, Amber Bland, on the near-east side of Columbus, Ohio. T. at 376. Gervins was selling marijuana to pay the bills and was associated with a gang called the Bloods. T. at 377. During this same time frame, Ms. Bland informed him that Gervins and her brother (Richard Bland) were closely associated with a man named Reginald Conley. T. at 378. He learned Conley went by the street name "Twice." T. at 378.

**{¶13}** Ms. Bland explained that late in the morning on November 9, 2012, Gervins and Ms. Bland ordered pizza and "chilled" at their residence with his friend "Blaze" (later identified as Domino Mack) and Blaze's girlfriend. T. at 379. After they finished eating pizza, Gervins received a phone call and stated that he had to leave but would be back. T. at 380. Before Gervins left, Ms. Bland heard him go into the laundry room and retrieve an unknown quantity of money from a safe in the ceiling. T. at 381-382. Shortly thereafter, Gervins left with Blaze and Blaze's girlfriend. Ms. Bland then fell asleep with her children. T. at 383.

**{¶14}** Several hours later, Ms. Bland was awoken by a phone call from Gervins. T. at 383. When she answered the phone, he immediately stated "Babe, I've been shot" and hung up the phone. T. at 383. This call was placed at 5:44 P.M. Ms. Bland immediately called him back and had a short conversation with him. Gervins sounded scared and out of breath. T. at 384.

**{¶15}** When Ms. Bland called him back, Gervins stated that he had been shot and that he was in New Albany. When Ms. Bland asked if he knew who shot him, Gervins

stated that it was "Ice" who shot him and that she was not to tell anyone. She stayed on the phone with him until the paramedics arrived a few minutes later and the phone was hung up. T. at 385.

{¶16} Ms. Bland went to the hospital to be with Gervins and was accompanied by a number of his friends and family. One individual she spoke with at the hospital was "Blaze." T. at 387. Because "Blaze" was the last person she had seen Mr. Gervins with that day, she spoke with him about what had transpired. She then provided that information to Gervins' sister (Dena Bronaugh) and to detectives from the Delaware County Sheriff's Office. T. at 387- 388.

{¶17} Ms. Bland stayed with Mr. Gervins at the hospital most of the week that followed the shooting. During that time he was intubated and unable to breath without the assistance of a tube down his throat. Ultimately, Mr. Gervins succumbed to his injuries on November 18, 2012. T. at 389.

{¶18} Dr. Gerston testified that Gervins was shot in the lower-mid back. The bullet travelled at an upward trajectory perforating the liver and the right lung of Gervins. T. at 472-474. This would have caused continuous internal bleeding, difficulty breathing, and immobility in a matter often to fifteen minutes. T. at 475. Despite efforts to save Gervins' life, he ultimately died as a result of the gunshot wound to the back. T. at 477.

{¶19} In the days immediately after the shooting, Detectives from the Delaware County Sheriff's Office began to make use of the leads provided by Gervins' family at the hospital. Det. Gannon used the contact information provided by Gervins' family and subpoenaed Conley's call detail records for the relevant timeframe. T. at 1219-1220. When he received information that Jermaine Kelly may have been involved in the

shooting, he obtained historical cell phone records for Kelly as well. T. at 1221. Det. Gannon also subpoenaed Gervins' cellphone records.

{¶20} The records identified numerous calls between Conley and Gervins and between Conley and Kelly on the date of the shooting. These records were ultimately given to Det. Moledor for cell phone mapping. T. at 1223. Det. Moledor was able to map the locations of cell phones belonging to Dontee Gervins, Jermaine Kelly, and Reginald Conley around the time Gervins was shot.

{¶21} Generally speaking, all three phones were in the area of the Wilson Market on the near east side of Columbus approximately one hour before the shooting. Between 5:00 P.M. and 5:45 P.M. all three phones can be seen traveling northbound out of Columbus. At 5:33 P.M. Kelly's phone connected to a cell phone tower approximately 2.7 km. from the location of the shooting. That tower would have been the closest to Kelly when the call was made. T. at 981. By approximately 6:00 P.M., Kelly and Conley's phones can both be seen traveling southbound back into the Columbus area. No data from the cell phone mapping was inconsistent with Conley and Kelly being present at the shooting on Redbank Rd. T. at 985.

{¶22} Around the time of Gervins' death, investigators were attempting to identify possible suspects and motive for the shooting. Det. Gannon learned that approximately ten days prior to the shooting, Gervins had been involved in a shooting on Gault St. in Columbus. Det. Gannon obtained records from Columbus Police regarding the Gault Street shooting and learned that Gervins was suspected as being the driver in a robbery that ultimately resulted in the death of two individuals. T. at 1238. The information indicated a man named "Twice" was also involved in the Gault St. shooting. The fact that

both shootings involved someone with the street name "Twice" and Gervins led him to interview Mary Page and Jonathan Dantzler. T. at 1239-1240.

**{¶23}** Mary Page testified that in 2012 she allowed Gervins to sell drugs out of her residence. T. at 732. This residence was across the street from an apartment complex on Gault St. in Columbus, Ohio. T. at 734. Page testified that in the days leading up to the death of Gervins, men identified as "Twice" and "Jesus" (whom she later identified as Jonathan Dantzler) came to her residence with Gervins. T. at 734-736. "Twice" and Dantzler asked Page to knock on the door of a crack dealer she knew in the Gault St. Apartments. The plan was that Conley and Dantzler would then rob the dealer at gunpoint, while Gervins would remain in the car to facilitate their escape. T. at 735; 739-740.

**{¶24}** Page explained that when she, Dantzler, and "Twice" approached the door to the residence, she knocked on the door and inquired of an occupant if she could buy drugs. When she was told no by the occupant, she asked to use the bathroom. T. at 739. When she was told she could not use the bathroom, "Twice" and Dantzler began shooting into the apartment and went inside. Page did not enter the residence and instead fled the scene.

**{¶25}** When Page arrived home, she saw "Twice" and Dantzler get into the car with Gervins and drive off. T. at 740. Page explained that when she saw "Twice" and Gervins later in the day, "Twice" told her not to say anything and told her to implicate two dark skinned guys if questioned about the robbery. T. at 743. At this time, Gervins gave her some drugs. Neither Gervins, Dantzler, nor "Twice" were dark skinned. T. at 744.

**{¶26}** Later that day, Page learned that someone had been killed in the shooting and one person was critically injured. T. at 743. Shortly thereafter, Columbus Police

arrived at her home and arrested her for her involvement in the robbery. She initially told investigators it was two dark-skinned guys who put her up to it, but decided to tell the truth a few moments into her six minute interview. T. at 745. She later identified Gervins as the driver, Dantzler as "Jesus", but did not know who "Twice" was. T. at 756. Page ultimately pled guilty to manslaughter with a firearm specification and testified against Dantzler at his trial. T. at 728-729.

{¶27} Dantzler testified that he was convicted for two counts of homicide arising out of the Gault St. shooting described by Mary Page. T. at 1072. He stated that on the day of the Gault St. shooting, he went to the Gault St. residence in question with Reginald Conley ("Twice"), Gervins, and Page. T. at 1075. Dantzler explained that Gervins drove him, Conley, and Page to the Gault St. residence and that Gervins remained in the car while Page, Conley and he went up to get drugs from the apartment. T. at 1076. Dantzler was arrested a few days after the shooting.

{¶28} On the day Gervins was shot, Dantzler was incarcerated awaiting trial for the Gault St. shootings. T. at 1072. While incarcerated, Dantzler placed a phone call to his brother Jermaine Kelly (who goes by "Mac Maine" and "Maine"). T. at 1069; 1073. On that call, Kelly informed Dantzler that he was 'just with Twice." Kelly then stated "I hope we shoot good." Kelly then informed Dantzler that they "shot a little deer." T. at 1168-1169. This call was placed on November 9, 2012 at 6:34 P.M. and occurred less than an hour after Gervins' shooting. In a call to his mother Kelly acknowledged his participation in this call. T. at 1160.

{¶29} As part of the investigation, investigators attempted to locate the vehicle described by Gale Dunlap. Det. Gannon testified he located a traffic citation issued to

Reginald Conley in August of 2012. The ticket indicated Conley was driving a 2006 Ford Fusion, green in color, with a plate matching the one he borrowed from Christopher Hall. T. at 1232-1233. This prompted detectives to interview Christopher Hall.

**{¶30}** Christopher Hall testified that he knew Reginald Conley as "Reggie Two Times" and "Twice" in mid to late 2012. T. at 531. Hall explained that in 2012, he owned a green Ford Fusion that he had lent to Conley. T. at 532, 536. Conley had possession of the vehicle for at least several weeks. In late 2012, Hall received a phone call that he could retrieve the vehicle. T. at 537. However, Hall was unable to retrieve the vehicle because the Columbus Police impounded it prior to his arrival. T. at 538. This vehicle was later turned over to the Delaware County Sheriff's Office for processing. T. at 566.

**{¶31}** BCI Supervising Agent Gary Wilgus testified he processed the vehicle Hall provided Conley during the timeframe in question. T. at 566. As part of the processing of that vehicle, Agent Wilgus photographed the interior and exterior of the vehicle. T. at 568-585. Additionally, he attempted to locate the presence of gunshot residue, blood, and latent fingerprints. T. at 571-594. He explained that had a firearm been discharged inside the motor vehicle, there would have been gunshot residue present. T. at 581. Ultimately, no evidence of gunshot residue or blood was located on the vehicle itself. T. at 590-591, 620.

**{¶32}** While no gunshot residue was identified on the vehicle itself, Agent Wilgus documented a blue Champion sweatshirt in the backseat of the vehicle he processed. T. at 571. When the sweatshirt was forensically processed, gunshot residue and the DNA of Reginald Conley were found on it. T. at 637-644, 687-689. Daniel Steiner also testified

that fingerprints lifted by Agent Wilgus from inside the vehicle were left by Conley. T. at 718.

**{¶33}** During the course of the investigation, Reginald Conley made some statements about what occurred in this case. When interviewed by Det. Gannon, he identified himself as "Twice." T. at 1241. He stated that on the date of the shooting, he received a call from Gervins. In response to that call, Conley met up with Gervins at the Wilson Market. He stated Gervins was brought to the market by "Blaze" (Domino Mack); the three waited there for the arrival of Conley's cousin. T. at 1243. After waiting with them for a short time, Conley claimed he walked to his grandma's house a couple blocks away. T. at 1244. Conley stated he had his phone with him all day and that if law enforcement checked the records it would show him at his grandma's house near Wilson Market. T. at 1248.

**{¶34}** In addition to speaking with law enforcement, Conley made statements to Ms. Bland about Gervins' shooting. Ms. Bland testified she saw Conley, whom she also knew as "Twice", on Near Year's Eve of 2012 at an establishment called 'The Moonlight." T. at 392. When she saw him, he approached her and they discussed the shooting of Gervins. T. at 395. He stated he was with Mr. Gervins when he went up to Delaware on the day Gervins was shot. He further stated he had a gun on his person at the time Gervins was shot. T. at 395. Ms. Bland identified Mr. Conley in the courtroom as the person she knew as both Reginald Conley and "Twice." T. at 391.

**{¶35}** Conley made additional statements regarding the incident to his cousin Lamonte Rayford. Rayford is also the brother of Amber Bland. Rayford testified he learned that Gervins, his sister's paramour, was shot while Rayford was incarcerated in

Franklin County. T. at 784. He explained his sister, Amber Bland, told him what she knew while he was at the Workhouse in Franklin County. This prompted Rayford to call "Twice" (Reginald Conley) from jail. T. at 787.

{¶36} During this call, Rayford discussed with Conley what had transpired with Gervins and the Gault St. shooting for which Dantzler had been arrested. T. at 795. Rayford commented to Conley that he heard Conley was out doing his "thug" too (meaning committing the same offenses as Dantzler). After laughing, Conley stated "they got my name in their mouth" (meaning individuals are accusing him of something). T. at 796-797. When the topic turned to the shooting of Gervins, Conley made some self-aggrandizing comments and then laughed when Rayford suggested Conley had left Gervins for dead. T. at 799.

{¶37} Finally, Appellant presented statements Conley made to fellow inmate Christopher Brookman. Christopher Brookman testified he was incarcerated at the Delaware County Jail with Reginald Conley while both were awaiting disposition of their criminal cases. T. at 921. Brookman explained that on one occasion an inmate "trustee" at the jail had a brief conversation with Conley which caused Conley to become upset. T. at 923-24. When Brookman questioned Conley about why he was upset, Conley stated he learned someone he knew on the street was going to testify that Conley had admitted to the crime for which he was awaiting trial. T. at 926. Conley then indicated that "he never should have trusted that weak-ass nigger. I shouldn't have never said nothing to him." T. at 927.

{¶38} Appellant also presented a number of Kelly's statements at trial. Detective Arthur Kester, III, testified he interviewed Jermaine Kelly on two separate occasions. He

was first interviewed on December 14, 2012. T. at 1153. During the interview Kelly denied knowing anyone by the name of Reginald Conley, "Twice", or "Baby Twice." He further denied knowing an individual by the name of Jonathan Dantzler, "Jesus" or "Baby Jesus." T. at 1155. During the second interview with Kelly, Kelly requested to see the evidence against him. When the Detectives produced a binder and started to go through the evidence Kelly told them to shut the book and left the interview. T. at 1157.

{¶39} Months after Gervins' shooting, Kelly also made statements to Lamonte Rayford regarding Gervins' shooting. Rayford explained he met Kelly after his release from prison and knew him as "Mac Maine." T. at 803. Rayford testified he began to see Kelly daily at the "Taste of Chicago" pizza shop near where they lived. While Rayford described himself as merely an acquaintance of Kelly, he explained his cousin "Meme" (Demetrius Edwards) was very close to Kelly. T. at 806.

{¶40} Rayford explained that on one occasion, Rayford and "Meme" began discussing the Gervins shooting in the presence of Kelly. At that time, Kelly explained that Gervins had to be killed because Gervins was going "to tell on some shit that went down." Kelly explained that he had been the one who shot Gervins. He explained that Gervins was taken to Delaware to go get money and told he had to switch seats in the car. When Gervins exited the car, Kelly shot him. T. at 807-809.

{¶41} As part of the investigation, law enforcement forensically processed the phones of Conley and Kelly. T. at 1113. The iPhone that was examined was associated with the phone number (614) 316-1329. It contained numerous messages suggesting Jermaine Kelly (Mac Maine) was using the phone in November and December of 2012. This phone was taken from Kelly's person upon his arrest. T. at 1125-1129. The phone

was linked to a "Mac Maine" Facebook page with associated email addressed JermaineKelly82@yahoo.com and MacMaine.3@yahoo.com. Kelly's phone also included contact information for "Baby Twice."

{¶42} Detective Ullom also examined the Blackberry Curve associated with phone number (614) 701-0403 and taken from the person of Reginald Conley. T. at 1134. This phone and corresponding number were provided to law enforcement by Conley during his initial interview. T. at 1246. The data recoverable from the phone was quite limited as it appears that the phone was newly activated on November I8, 2012 at approximately 6:48P.M. T. at 1136-1137. Det. Gannon testified that Conley activated the cell phone the same day Gervins died. T. at 1247.

{¶43} At trial, Appellee also presented the testimony of Richard Bland. Mr. Bland testified that he was the brother of Lamonte Rayford and Amber Bland. T. at 882. He testified the street name of Reginald Conley was "Twice" and was familiar with Jermaine Kelly being "Mac Maine." T. at 883. He explained that he didn't know Kelly very well, but that Conley was his cousin. T. at 885. He testified that around the time Gervins was shot, Conley was driving a greenish Ford Fusion that had a mirror missing on the passenger side. T. at 888.

{¶44} Appellee presented additional testimony relevant to the gang specification at trial. Lamonte Rayford, a cousin to Reginald Conley, testified he has been a gang member for most of his life in the Columbus area. He explained how individuals typically join a gang. He explained that one can commit a variety of offenses (i.e. sell drugs, rob people, or kill people) or they can be "blessed" into a gang if they have someone in their family with sufficient tenure and rank in the gang. T. at 774. He further explained that

gangs typically have certain geographic territory within the city that can affect which gang individuals in the area join and one's family relationship has some bearing. T. at 775.

{¶45} Based upon where he lived and whom he was related to, Rayford testified he was a "Blood." However, he commonly associated with "Crips" who he knew to engage in robberies, drug transactions, and other illicit acts. T. at 776. In 2012, Rayford was associated with the "ATM Crips" ("Anytime Money Crips"); other members included "Twice" (Reginald Conley), "Meme" (Demetrius Edwards), "Van" (Conley's brother), and several others. The purpose of this gang was to get money by any means necessary. T. at 777-778. Reginald Conley had "ATM" tattooed on his body to identify himself as a member of this gang. T. at 779.

{¶46} Outside the presence of the jury, Rayford explained that back in 2012 he and Conley would consume and sell marijuana, codeine, methazine, pills, and powders together. T. at 867. He explained that they got money for drugs by "hustling" (selling drugs) and "robbing." T. at 868. On a number of occasions, he saw Conley sell drugs. T. at 868. Hall also testified Conley sold drugs to support his own habit. T. at 554. Rayford testified he committed a number of robberies with Conley in 2012. T. at 870. When asked for the names of specific stores they robbed together, he indicated he would rather not answer that question.

{¶47} Outside the presence of the jury, Dantzler explained that he was from Trevitt Heights and the gang that controls that area is called the Crips. T. at 1085. He explained that he was a Crip and that there were certain colors and signals associated with the gang. T. at 1087. Dantzler explained that he would sell crack cocaine around his part of

the city to make ends meet. T. at 1088. He explained that he also identified as an "ATM Crip." T. at 1090.

**{¶48}** The jury found Appellant Conley guilty of two counts of Murder and one count of intimidation of a Witness. Appellant was also found guilty of one firearm specification and one specification of gang affiliation for each of the above counts. Appellant was not found guilty for Weapons Under Disability, as this count was dismissed as a result of a motion for Rule 29 acquittal.

**{¶49}** Appellant Conley now appeals, assigning the following error for review:

ASSIGNMENTS OF ERROR

**{¶50}** "I. THE TRIAL COURT/JURY ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT IN ENTERING A GUILTY VERDICT TO THE OFFENSE [SIC] OF RAPE [SIC] AS THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS.

**{¶51}** "II. THE TRIAL COURT/JURY ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT IN ENTERING A GUILTY VERDICT TO THE OFFENSE [SIC] OF RAPE [SIC] AS THE VERDICTS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶52}** "III. APPELLANTS [SIC] SIXTH AMENDMENT RIGHT TO CONFRONTATION WAS DENIED WHEN THE STATE ADDUCED EVIDENCE OF A CO-DEFENDANTS [SIC] ADMISSIONS IMPLICATING APPELLANT AND WHERE THE CO-DEFENDANT DID NOT TESTIFY."

**I., II.**

**{¶53}** In his First Two Assignments of Error, Appellant argues that his convictions for murder were against the manifest weight and sufficiency of the evidence. We disagree.

**{¶54}** On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also, State v. Thompkins*, 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶55}** We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

**{¶56}** Appellant, in the case *sub judice*, is challenging his convictions for the murder of Dontee Girvens in violation of R.C. §2903.02 (A). Such section states: (A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

**{¶57}** Appellant initially argues that his conviction is against the manifest weight and sufficiency of the evidence because Appellee did not prove beyond a reasonable doubt that (1) he was identified as the shooter, or (2) that the shooting took place in Delaware County.

**{¶58}** Upon review, this Court finds based on the testimony presented at trial as set forth above, that the State presented proof beyond a reasonable doubt that Appellant was guilty of the murder of Dontee Gervins.

**{¶59}** The jury heard testimony from both Amber Bland and Lamonte Rayford that Appellant admitted to them that he was involved on Gervins' murder. Further, evidence was presented as to cell phone tower data which placed Appellant, his co-defendant Kelly and Gervins together in Delaware County. Also, the telephone call Gervins made to Ms. Bland after he was shot placed him in Delaware County. Further, Gervins told the medic who was treating him that he was shot "here" and indicated in front of Ms. Hilbrands' residence. Additionally, Dr. Gerston testified that based upon Gervins' injuries and the fact that the bullet perforated Gervins' liver and lung, he would only have been able to move for 10 to 15 minutes after being shot, as his blood pressure would drop and his lungs would fill with blood.

**{¶60}** There was also ample evidence presented that Gervins was the only witness to the Gault Street shootings who could have testified against his cousin Jonathan

Dantzler, who was in jail awaiting trial, and who could identify and inform the police that Appellant was also involved those shootings. Co-defendant Jermaine Kelly received a call from Dantzler, who is Kelly's brother, from the jail less than an hour after Gervins was shot. During this call Kelly informed his brother that he was "just with Twice" and that they "shot a little deer".

**{¶61}** Based on the foregoing, together with all of the evidence presented, we find that Appellant's murder conviction was supported by sufficient evidence and that the jury did not lose its way in finding Appellant guilty beyond a reasonable doubt.

**{¶62}** Appellant's First and Second Assignments of Error are overruled.

III.

**{¶63}** In his Third Assignment of Error, Appellant argues he was denied his Sixth Amendment right to confrontation when Lamonte Rayford was permitted to testify as to certain statements made to him by co-defendant Jermaine Kelly, when Kelly himself did not testify. We disagree.

**{¶64}** Appellant claims Lamonte Rayford's testimony that Kelly told him "they took him to Delaware and had him switch seats" and "[t]hey were basically telling him ..." violated his right to confrontation.

**{¶65}** Initially, we note Appellant did not object to the first statement and the trial court sustained his objection to the second statement. We therefore review the admission of the statements for plain error.

**{¶66}** Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding an accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused

bears the burden to demonstrate plain error on the record, *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings," *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

**{¶67}** Even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *Id.* The Ohio Supreme Court recently clarified in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, that the accused is "required to demonstrate a reasonable *probability* that the error resulted in prejudice - the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* at ¶ 22, *citing United States v. Dominguez Benitez*, 542 U.S. 74, 81–83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). *Accord, State v. Thomas,* ___ Ohio St.3d ___, 2017-Ohio-8011, ___N.E.3d ____ (Oct. 4, 2017), ¶32-34.

**{¶68}** If the accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; the Supreme Court has "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.' " (Emphasis added.) *Barnes* at 27, 759 N.E.2d 1240, *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. *Accord, State v. Thomas,* ___ Ohio St.3d ___, 2017-Ohio-8011, ___N.E.3d ____ (Oct. 4, 2017), ¶32-34.

**{¶69}** "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d

1056 (1991). Evid.R. 402 states that all relevant evidence is admissible. "Relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

{¶70} In *State v. Crotts,* the Ohio Supreme Court explained,

As a legal term, "prejudice" is simply "[d]amage or detriment to one's legal rights or claims." Black's Law Dictionary (8th Ed.1999) 1218. Thus, it is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all prejudicial evidence - to do so would make reaching any result extremely difficult. Rather, only evidence that is unfairly prejudicial is excludable.

'Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' " *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169, 172,

743 N.E.2d 890, *quoting Weissenberger's Ohio Evidence* (2000) 85–87, Section 403.3.

104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23-24.

**{¶71}** In the case at bar, Rayford testified that he had a conversation with his cousin Demetrius Edwards and Jermaine Kelly about why Gervins had to die. During questioning by the State, Rayford testified as follows:

Q:      Without going into what Kelly said or may have said about other people, what did Kelly say he did?

A:      He said he shot Dontee.

Q:      And how did he say it happened, what he did?

A:      He called Dontee, told him he had some money for him, but he had to go to Delaware, and told him he had to switch seats. So when he got out to switch seats, that's when he shot Dontee.

Q:      From what he said, did it sound like the shooting happened outside the car?

A:      Yes.

Q:      And from what he said, Kelly indicated he was the shooter, correct?

A:      Yes.

Q:      Based on your experience, your life experience, do you have any idea why they would need to switch seats at that point?

A:      Basically, my knowledge is to get him out of the car. They were basically telling him ...

Atty. Gordon: Object.

Court: Sustained.

**{¶72}** (T. at 808-809).

**{¶73}** The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." "The United States Supreme Court has held that the right to confrontation is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendants having had the opportunity to cross-examine the declarant. *Crawford,* 541 U.S. 36, 68." *State v. Syx,* 190 Ohio App.3d 845, 2010–Ohio–5880, 944 N.E.2d 722, ¶ 23 (2d Dist.). The *Crawford* court stated that "the core class of testimonial statements includes statements 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' *Id.* at 52." *Syx* at ¶ 23. The Sixth Amendment's Confrontation Clause applies only to testimonial statements and does not apply to non-testimonial statements. *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21.

**{¶74}** To determine whether a statement to a person not engaged in law enforcement is testimonial, the "objective witness" test is applied. *Siler* at ¶ 26-27. This test requires the court to determine whether an objective witness would have reasonably believed that her statement would be available for use at a later trial. *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36. The test focuses on the expectation of the declarant at the time the statement was made. The intent of the questioner is irrelevant unless it could affect a reasonable declarant's expectations. *Id.*

{¶75} Applying this precedent, the admission of Kelly's statements to Rayford and Edwards, both friends, which incriminated himself and Appellant in a homicide would not implicate the confrontation clause as the primary purpose of the statement was unrelated to creating evidence for prosecution. Pertinent circumstances include the fact the statement was not made to law enforcement or other authority and the statement was made during a conversation with friends.

{¶76} Based in the foregoing, we find Rayford's testimony as to Kelly's statements were not testimonial and therefore were not prohibited by the 6th Amendment.

{¶77} Appellant's Third Assignment of Error is overruled.

{¶78} For the foregoing reasons, the judgment of the Court of Common Pleas of Delaware County, Ohio, is affirmed.

By: Wise, J.

Delaney, P. J., and

Baldwin, J., concur.

JWW/d 0110