[Cite as *State v. Howard*, 2024-Ohio-1409.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 22CA6 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| WESLEY A. HOWARD, | : | |
| Defendant-Appellant. | : | **RELEASED 4/10/2024** |

_____

<u>APPEARANCES</u>:

Steven H. Eckstein, Washington Court House, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, Adam J. King, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.

_____

Hess, J.

**{¶1}** Wesley A. Howard appeals his conviction following a jury trial on multiple counts of aggravated drug trafficking and possession, as well as engaging in a pattern of corrupt activity. Three of his vehicles were also forfeited. The charges stem from a series of recorded controlled drug buys by confidential informants during October and November 2020.

**{¶2}** Howard contends the trial court violated his Sixth Amendment constitutional right to confrontation when it denied his motion to sever his trial from his codefendant. However, he did not renew his motion to sever after his first trial ended in a mistrial so he forfeited all but plain error. We find that the statements Howard contends violated his right to confrontation were not testimonial in nature. Therefore, his Sixth Amendment right to confrontation was not implicated.

{¶3}    Next, Howard contends that his convictions for aggravated drug trafficking that arose from the November 6, 9, and 12, 2020 controlled drug buys (Counts 2, 4, and 6) lacked sufficient evidence and were against the manifest weight of the evidence. He argues that the jury had to engage in impermissible stacking of inferences to conclude he was involved in the transactions. However, after viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found he was selling methamphetamine without violating the rule against stacking inferences. And, after our review of the record, and after we consider the evidence and testimony adduced at trial and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence or lack thereof, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice such that Howard's convictions must be reversed and a new trial ordered.

{¶4}    Last, Howard contends that he received ineffective assistance of counsel when his trial counsel did not prepare an affidavit of indigency and demonstrate that he was unable to pay the $40,000 mandatory fines. However, Howard has failed to establish that his trial counsel's performance was deficient when he did not file an indigency affidavit prior to sentencing. And, even if an affidavit had been filed, Howard provides no proof that a reasonable probability exists that the trial court would have waived the fines.

{¶5}    We overrule Howard's assignments of error and affirm the trial court's judgment.

I.  FACTS AND PROCEDURAL HISTORY

**{¶6}** The Highland County grand jury indicted Howard on one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), a first-degree felony; four counts of aggravated drug trafficking with one count in the vicinity of a juvenile and one count in the vicinity of a school zone in violation of R.C. 2925.03(A)(1), second and third-degree felonies; four counts of aggravated drug possession in violation of R.C. 2925.11, third-degree felonies; and forfeiture specifications for four vehicles. Howard entered a not guilty plea and moved to sever his trial from his codefendant Christopher Hertzler. The trial court denied the motion and the matter proceeded to trial. However, due to a sudden medical emergency, the trial ended in a mistrial. Following the mistrial, the grand jury issued a superseding indictment that added an aggravated drug trafficking count and aggravated drug possession count for a controlled drug buy that occurred in October 2020.

**{¶7}** At trial, a number of witnesses testified about the numerous controlled drug buys. Because Howard contests the evidence supporting his convictions on counts two, four, and six, which are the November 6, 9, and 12, 2020 controlled drug buys, our discussion of the evidence will focus primarily, but not exclusively, on testimony about these transactions.

**{¶8}** Officer Brian Butler testified that he investigates covert drug operations for the Hillsboro Police Department and works with other investigators and confidential informants. He explained the procedures law enforcement follow when using confidential informants for controlled drug buys. Officer Butler testified that he was involved in a controlled drug buy with two confidential informants on November 6, 2020 at Christopher Hertzler's residence. The confidential informants had hidden audio and video recording

devices and Officer Butler monitored the transaction through the audio devices as well as visually from his vehicle. While the confidential informants were at Hertzler's residence, a white Ford Taurus with a black grill cover, tinted windows, and a tinted license plate cover pulled into Hertzler's driveway. Officer Butler was familiar with the white Ford Taurus as the vehicle previously used by Howard on a drug deal at a parking lot five days earlier on November 1, 2020. Officer Butler testified that on the audio/video recording of the November 6, 2020 drug buy, when the white Taurus pulled into the driveway, codefendant Hertzler made a statement that "his dude was coming." After the transaction concluded, the confidential informants left Hertzler's residence and met up with Officer Butler. Audio and video recordings from that buy were played for the jury.

{¶9} Officer Butler was also involved with the controlled drug buy on November 9, which was arranged to take place in a fast-food restaurant parking lot in Hillsboro. He was involved in the surveillance of the controlled buy and was monitoring communications between the confidential informant and Howard's codefendant, Hertzler, which was audio and video recorded. Officer Butler met up with the confidential informant after the buy and recovered the drugs from the sale. Officer Butler testified that on the controlled buys that he was involved with, he did not see Howard, but did see Howard's white Ford Taurus. Officer Butler testified that the white Ford Taurus was unique because of the combination of its characteristics of the tinted license plate cover, tinted windows, and black grill cover. "I haven't seen one like it then or since."

{¶10} Miller J. Baldwin testified that he had a past criminal history involving felonies and now he works with law enforcement to make drug buys. He was a former drug user but has since stopped using drugs. He informed law enforcement that he could

purchase illegal drugs from a dealer named Stephen Debo, who got his drugs supplied to him by Howard. Baldwin testified that he was involved in a controlled drug buy on October 9, 2020 involving Debo and Howard. Both Debo and Howard arrived in a Jaguar, with Howard driving. Debo got out of the car and handed Baldwin the drugs. Baldwin said someone wanted to check the drug's weight but Baldwin testified that Debo stated " 'I, I don't have no scales. Maybe Wes does.' And I turned around and he said he didn't have none."

**{¶11}** Stephen Debo testified that he entered a plea of guilty to trafficking in methamphetamine and, in exchange for his guilty plea, he agreed to give testimony about Howard, a person he has known for approximately three years. Debo testified that he was involved in a drug transaction on October 9, 2020 with Baldwin in which Baldwin wanted a quantity of methamphetamine that Debo did not have. As a result, Debo contacted Howard because "I didn't have access to anything like that, he did. He had the bulk amount." Debo testified that the plan was to establish a deal between Debo, Baldwin, and Howard by which Baldwin and his associates from Portsmouth would become long-term customers. Like Baldwin's testimony, Debo testified that he asked Howard for a scale and Howard told him he did not have one. Debo testified that he travelled with Howard to do the sale because Howard had larger quantities of drugs and Debo was also working off a debt he owed Howard for crack that Debo had purchased from Howard. Debo also testified that Howard was the one who determined the price to charge for the drugs.

**{¶12}** Rebecca South testified that she had been a previous drug user but had no felony criminal record, nor had she ever been convicted of a crime involving dishonesty and she had been drug-free for approximately two years. South testified that about two

years ago, she became involved as an undercover drug buyer and confidential informant, working with Investigator Randy Sanders of the Highland County Prosecutor's Office and other law enforcement. South testified generally about the process of setting up controlled drug buys. She testified that she was involved in setting up a controlled drug buy with Howard in November 2020. She knew Howard from school. She texted Howard through her phone to arrange for a purchase of methamphetamine. South testified that on November 1, 2020, she met Howard at the back of a Kroger parking lot and purchased methamphetamine from him. The transaction was audio recorded. Howard arrived in a white Ford Taurus car, with darkly tinted windows and darkly tinted license plate cover, with a black grill cover on the front. South sat inside Howard's car talking with Howard for approximately 15 minutes during the transaction. South complimented Howard on the car during their recorded conversation. At trial she testified that Howard's car was "a super nice car. I mean, I thought it was really nice." On the audio tape, South clearly recites the license plate number of Howard's car for law enforcement.

{¶13} South was involved in the November 6, 2020 controlled drug buy, which she and her husband arranged with Investigator Sanders. The drug buy was arranged with codefendant Hertzler, occurred at Hertzler's house, and was audio and video recorded. South testified that she and her husband went inside Hetzler's residence to make the purchase. South said that at some point they had to go back outside and move their car so that Hertzler's "guy could pull in." South testified that she, her husband, and Hertzler "had to sit and wait on his guy to bring the stuff." When a car pulls in, Hertzler asks South and her husband for the money for the drugs. South testified that the car that pulled into Hertzler's drive was Howard's car, the same white Ford Taurus that Howard drove to the

controlled drug buy South made from him in the Kroger parking lot five days earlier. She testified that she "knew that was Wesley Howard's car * * * because I had met up with him in that car" on the November 1, 2020 controlled buy. South also testified that she had seen the car several times around town and each time she saw it, she saw that Wesley Howard was the driver and she had seen him get out of it at various stores around town. South testified that Hertzler went outside to "get the dope from his guy." South testified that when they saw the white Ford Taurus pull in, Hertzler said, "my dude is here, I'll be back." After the buy concluded, South and her husband met up with Investigator Sanders and went through the usual post-controlled buy procedures.

{¶14} South also testified about her involvement in the controlled drug purchase that occurred on November 12, 2020 (she did not testify about the November 9, 2020 purchase). This controlled buy was also audio and videotaped. South and her husband texted Hertzler. Hertzler sent them a pin drop location on Hill Road where he wanted to meet them. South testified that she and her husband drove to the location Hetzler gave them and the location was a stop sign in the middle of nowhere. Hertzler told South and her husband that he was at Hickory Trails. When Hertzler arrived, South's husband got into Hertzler's car and made the purchase. They then met up with Investigator Sanders and went through the post-controlled buy procedures.

{¶15} Investigator Randy Sanders of the Highland County Prosecutor's Office testified that he has been in law enforcement for 40 years, served on several major drug crime task forces, and has specialized training in illegal narcotic investigations. Investigator Sanders was familiar with the drug trade jargon and testified that a person's "dude" is the person they are getting dope from, a "ball" or "8-ball" is 3.5 grams of an

illegal drug, a "zip" is an ounce of an illegal drug, being "taxed" is getting charged too much, and "are you good?" means do you have dope available to purchase. Investigator Sanders testified about the process of working with civilians on undercover drug operations. Sanders was involved in the controlled buy between Baldwin and Debo on October 9, 2020. Immediately after the drug transaction, Sanders witnessed Howard and Debo meet up at a gas station parking lot, Howard drove up his Jaguar and parked next to Debo's truck. Both men got outside of their vehicles, then both got back inside their vehicles and drove off. Investigator Sanders and another law enforcement official in a separate car followed Howard in the Jaguar and saw it had driven to and parked in front of Howard's residence on Woodland Trail.

{¶16} Investigator Sanders also worked with South and her husband, who had told Sanders that they thought they could make undercover drug buys from Howard. Investigator Sanders heard South read off the license plate of the white Ford Taurus that Howard drove to meet her at the November 1, 2020 buy and the vehicle was registered to Wesley Howard's mother.

{¶17} Investigator Sanders testified that he was involved with the November 6, 2020 controlled drug buy that occurred at Hertzler's residence. Sanders monitored that buy from his vehicle, where he was parked in a fast food restaurant near the residence. He watched South and her husband enter Hertzler's residence and could hear the audio tape as the transaction was occurring. Investigator Sanders watched Wesley Howard's white Ford Taurus pull into Hertzler's driveway and heard Hertzler say "his dude was there," which means the person providing the dope. Howard's vehicle arrived at approximately 5:27 p.m. and was there for approximately five minutes, leaving at

approximately 5:32 p.m. South and her husband concluded the purchase and left at about 5:37 p.m. They met up with Investigator Sanders and went through the standard post-controlled buy procedures.

{¶18} Investigator Sanders also worked with South's husband on the November 9, 2020 controlled drug buy that occurred at a fast food restaurant parking lot. Investigator Sanders was watching Hertzler's residence and learned through other surveillance officers monitoring the November 9 buy that Hertzler said it was going to be 40 minutes before he would be at the fast food parking lot. Sanders decided to drive to Howard's house on Woodland Trail to see if Hertzler was getting his drugs from Howard. He came across Hertzler driving that way so he followed Hertzler and saw that Hertzler parked in the driveway of Howard's residence. A few minutes later, Sanders heard from the other surveillance officer that Hertzler had reported that he had the dope and was on his way back. Investigator Sanders followed Hertzler back from Howard's residence and saw him go to the fast food parking lot and meet up with South's husband to make the drug deal.

{¶19} Investigator Sanders was involved in the November 12, 2020 controlled drug buy. He prepared the Souths before the buy and performed post-controlled drug buy procedures after the transaction. This transaction took place at the Rocky Fork Lake area on Hickory Trail based on a pin drop that Hertzler provided to the Souths. Sanders followed the Souths until they turned off on Hickory Trail and monitored them via contemporaneous audio recording. After the deal was completed, Sanders drove past Howard's residence on Woodland Trail and saw Hertzler's car parked at Howard's residence. Howard's residence was approximately a quarter to a half mile from the stop sign location for the drug transaction. Prior to the deal, Hertzler told the Souths he was

on his way and arrived a few minutes later. After the deal completed, Hertzler was back at Howard's residence within three minutes.

**{¶20}** Investigator Sanders also testified that he was part of a law enforcement team that executed a search warrant on Howard's residence on Woodland Trail in September 2021, approximately a year after the October and November 2020 controlled drug buys. Law enforcement had to break into the house because Howard, who was inside, did not respond to their knocking. It took law enforcement 10 to 15 minutes to access the interior of the residence after they knocked and announced their presence. During the search, law enforcement found scales, a safe and two lockboxes with $1,100, a money counter, several spiral notebooks with names and numbers, and surveillance cameras on the exterior and interior areas of the residence. Investigator Sanders testified that scales are commonly used to weigh drugs, a money counter is often used by drug dealers who handle large sums of money, notebooks are used to keep track of people who owe money for drugs, and surveillance cameras are used by drug dealers to monitor who is at the door and what is going on before letting people inside.

**{¶21}** Investigator Sanders testified that they did not find methamphetamine or the marked money used in the October and November 2020 controlled drug buys during the search, but he was not surprised. Investigator Sanders testified that it is common for dealers to hide their drugs elsewhere. And, Sanders believed that during the 10 to 15 minutes it took them to access the interior of the residence, Howard had disposed of the drugs down the toilet. There was an empty large plastic baggy on the floor in the bathroom and Howard was in the bathroom. Investigator Sanders was not surprised to find none of the marked money from the earlier October and November 2020 drug buys because of

the amount of time that had passed between those transactions and the search of Howard's residence. Investigator Sanders also testified that he reviewed phone records between Howard and Hertzler and found almost daily communication between the two during the October and November 2020 time frame.

{¶22} The jury found Howard guilty on all counts and found that three of his four vehicles were subject to forfeiture. The trial court found that the aggravated trafficking in methamphetamine counts and the aggravated possession of methamphetamine counts merged for purposes of sentencing. The state elected to have Howard sentenced on the aggravated trafficking offenses in counts two, four, six, ten and twelve. The trial court sentenced Howard to a prison term of 10 years on count one, 5 years each on counts two and four, and 18 months each on counts six, ten, and twelve, all to be served consecutively for a total prison term of 24.5 years.

## II.  ASSIGNMENTS OF ERROR

{¶23} Howard presents the following assignments of error:

I.      The trial court violated the defendant-appellant's right to confrontation, due process, and a fair trial when it denied his motion to sever his co-defendant from the trial and retrial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

II.     Defendant-appellant's convictions on counts two, four, and six are not based upon sufficient evidence thereby denying him his due process and a fair trial rights under the Fifth Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution.

III.    Defendant-appellant's convictions on counts two, four, and six are against the manifest weight of the evidence.

IV. Defendant-appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

## III. LAW AND ANALYSIS

### A. Motion to Sever

**{¶24}** Howard contends that the trial court abused its discretion when it denied his motion to sever his trial from his codefendant Hertzler. He argues that he was prejudiced because he could not cross examine Hertzler about the statement that "my dude is here" that Hertzler made inculpating Howard in the November 6, 2020 controlled drug buy. Two witnesses testified that during that transaction, Hertzler did not have the methamphetamine and was waiting on a "dude" to bring it to him. When Howard's white Ford Taurus pulled into Hertzler's driveway, the witnesses said Hertzler said that his "dude" was here. Hertzler's statements were recorded on the audio recording the Souths made of the buy. The state argues that Howard waived all but plain error because he did not renew his motion to sever after the trial court declared a mistrial.

### 1. Standard of Review

**{¶25}** A trial court's decision on a motion to sever is reviewed under an abuse of discretion standard. *State v. Powers*, 4th Dist. Scioto No. 19CA3868, 2020-Ohio-7042, ¶28. "An abuse of discretion connotes more than a mere error of judgment; it implies that the court's attitude is arbitrary, unreasonable, or unconscionable." *State v. Evans*, 4th Dist. Jackson No. 10CA1, 2012-Ohio-1562, ¶ 35. However, where the defendant fails to renew a motion to sever at the close of the state's case or at the conclusion of the evidence, it is forfeited and reviewed for plain error. *E.g., State v. Miller*, 105 Ohio App.3d 679, 691, 664 N.E.2d 1309 (4th Dist. 1995). Crim.R. 52(B) affords appellate courts

discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record,  and must show "an error, *i.e.,* a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, quoting *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Because Howard filed a motion to sever prior to the first trial, but did not renew the motion following the mistrial, at the conclusion of the state's case in the retrial, or at the conclusion of all evidence, he has forfeited all but plain error.

### 2.  Joinder of Multiple Defendants & The *Bruton* Rule

**{¶26}**  Crim.R. 8(B) governs joinder of defendants:

Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

**{¶27}**  The law favors the joinder of defendants and the avoidance of multiple trials because joinder conserves judicial and prosecutorial time, lessens the expenses of multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries. *State v. Sims*, 2023-Ohio-1179, 212 N.E.3d 458, ¶ 36 (4th Dist.). A defendant may obtain a severance if the defendant is prejudiced by the joinder. Crim R. 14 provides for separate trials of defendants "if it appears that a defendant * * * is prejudiced."  The decision to grant severance rests in a trial court's sound discretion. *State v. Torres,* 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

**{¶28}** Howard argues that his trial should have been severed from his codefendants Hertzler because statements made by Hertzler that implicate Howard would be introduced at trial and Howard would not be able to cross examine him, violating his Sixth Amendment right to confrontation as discussed under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

**{¶29}** In summary *Bruton, supra,* holds:

> " * * * in a joint trial of two defendants, a confession of one co-defendant who did not testify could not be admitted into evidence even with a limiting instruction that the confession could only be used against the confessing defendant. The rationale of Bruton was that the introduction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment."

*State v. Moritz*, 63 Ohio St.2d 150, 153, 407 N.E.2d 1268 (1980) quoting *United States v. Fleming*, 594 F.2d 598, 602 (7th Cir.1979).

**{¶30}** The Supreme Court of Ohio applies *Bruton* even when the statement does not explicitly implicate the co-defendant:

> (T)he Bruton rule applies with equal force to all statements that tend significantly to incriminate a co-defendant, whether or not he is actually named in the statement. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the Bruton rule. Just as one can be convicted on circumstantial evidence, one can be circumstantially accused.

*Moritz*, 63 Ohio St.2d at 155, 407 N.E.2d 1268; *State v. Fannon,* 2018-Ohio-5242, 117 N.E.3d 10, ¶ 26-29 (4th Dist.).

**{¶31}** However, before the *Bruton* rule applies, the statement must be "testimonial" in nature. *Fannon* at ¶ 28. The *Bruton* rule and the Confrontation Clause involve only "testimonial" statements. *State v. Luckie*, 2018-Ohio-594, 106 N.E.3d 289, ¶ 44 (5th Dist.); *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 38–39 (7th Dist.). A

"testimonial" statement is "one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36, quoting *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Luckie* at ¶ 45.

**{¶32}** In determining whether a statement is testimonial for *Bruton* and Confrontation Clause purposes, " 'courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations. This test conforms to *Crawford* and is supported by both state and federal authority. This definition also prevents trampling on other portions of hearsay law that *Crawford* expressly states do not implicate the right to confront witnesses.' " *Fannon* at ¶ 29, quoting *Stahl* at ¶ 36.

**{¶33}** Howard argues that statements Hertzler made during a controlled buy, which were surreptitiously caught on audio tape by law enforcement, that he was "waiting on his dude to bring him some stuff" and "his dude was here" were indirect references to Howard even though he was not named explicitly by Hertzler. Therefore, Howard argues they were incriminating even though Hertzler used "dude" rather than "Howard" in referring to him. The statements were part of the audio and video recordings played for the jury and were also referenced in the testimony of Officer Butler and Investigator Sanders.

**{¶34}** However, Howard's argument leapfrogs over the first step of the analysis. The first step is to determine whether Hertzler's "dude" statements were "testimonial" in nature. We find that the statements made by Hertzler were not testimonial in nature

because they were not made under circumstances which an objective witness would believe the statement would be available for use at a later trial. Hertzler made the statements during an illegal drug transaction to people he believed were legitimate customers and drug users. Hertzler made the statements without knowledge that they were being recorded by law enforcement. Based on these circumstances, we find that the "dude" statements were not testimonial and therefore do not violate the Sixth Amendment's Confrontation Clause. *Fannon* at ¶ 33-34 (apology letter written by defendant to codefendant about verbal abuse was not testimonial in nature because defendant would not have any expectation it would be found and read by law enforcement); *State v. Conley*, 2018-Ohio-298, 104 N.E.3d 243, ¶ 75 (5th Dist.) (statements made by a codefendant admitting that defendant and codefendant were involved in a murder were not testimonial in nature because they were made during a conversation between friends and not to law enforcement); *State v. Luckie*, 2018-Ohio-594, 106 N.E.3d 289 (5th Dist.) (statements made by codefendant while being punched and choked by victim's boyfriend were not testimonial); *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 39 (7th Dist.) (finding that codefendant's statements made to old friend in prison were not testimonial in nature and holding that "if the out-of-court statement of a non-testifying codefendant is not testimonial, then *Bruton* has no application because the confrontation clause has no application").

{¶35} Hertzler's statements about getting drugs from his "dude," meaning Howard, were not testimonial in nature and did not involve *Bruton* or the Sixth Amendment. Howard has failed to demonstrate plain error. We find no error – plain or

otherwise — in the trial court's decision to deny Howard's motion to sever. We overrule his first assignment of error.

### B. Sufficiency of the Evidence and Manifest Weight of the Evidence

**{¶36}** Howard contends for his second and third assignments of error that the evidence in this case did not support his conviction for aggravated trafficking in methamphetamine on counts two, four, and six, which involve the November 6 controlled buy at Hertzler's residence, the November 9 controlled buy at the fast-food parking lot, and the November 12 controlled buy at the pinpoint location by the lake and a quarter mile from Howard's residence.   Howard argues that "identification as a participant is required for a conviction" and because Howard "was never seen" by the witnesses, there was insufficient evidence that he participated in those three controlled buys.

### 1. Standard of Review

### a. Sufficiency

**{¶37}** "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Bennington,* 2019-Ohio-4386, 148 N.E.3d 1, ¶ 11 (4th Dist.).

**{¶38}** An appellate court must construe the evidence in a "light most favorable to the prosecution." *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). Further, "[t]he court must defer to

the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 22, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick*, 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.). Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.' " *State v. Davis*, 4th Dist. Ross No. 12CA3336, 2013-Ohio-1504, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). Rather, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

### b. Manifest Weight

{¶39} In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. To satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), syllabus; *State v. Harvey*, 4th Dist. Washington No. 21CA3, 2022-Ohio-2319, 2022 WL 2388455, ¶ 24. Because a trier of fact sees and hears the

witnesses, appellate courts court will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 61 (4th Dist.); *State v. Colonel*, 2023-Ohio-3945, 227 N.E.3d 336, ¶ 50-54 (4th Dist.).

## 2. Elements of Aggravated Trafficking

**{¶40}** Howard was convicted of aggravated trafficking in methamphetamine in violation of R.C. 2925.03(A)(1), which provides: "(A) No person shall knowingly do any of the following: (1) Sell or offer to sell a controlled substance or a controlled substance analog; * * *." Howard contends that he was not identified as "a person" involved in the drug transaction and contests this element of the crime.  He argues that the jury engaged in impermissible "stacking of inferences" to conclude that he was involved in the sale of the methamphetamine on each of the three occasions.  He argues that the only automobile at the scene during each controlled buy was his mother's white Ford Taurus. He argues, "It is readily apparent the [state] used circumstantial evidence to prove the identity of the co-defendant's 'dude.' [Howard's] mother's car was at the scene, so it must be [Howard] driving it, and he must be the dude."

**{¶41}** The elements of an offense may be established by " 'direct evidence, circumstantial evidence, or both. Circumstantial and direct evidence are of equal evidentiary value.' " *State v. Fannon*, 2018-Ohio-5242, 117 N.E.3d 10, ¶ 100 (4th Dist.), quoting *State v. Swain*, 4th Dist. Ross No. 01CA2591, 2002 WL 146204, *8 (Jan. 23, 2002). Circumstantial evidence is " ' "[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved." ' " *State v. Shields*, 2023-Ohio-2331, 221 N.E.3d 91, ¶ 34 (4th Dist.).

**{¶42}** We explained in *Shields, supra*:

"A trier of fact may not draw '[a]n inference based * * * entirely upon another inference, unsupported by any additional fact or another inference from other facts[.]' " ' 'When an inference, which forms the basis of a conviction, is drawn solely from another inference and that inference is not supported by any additional facts or inferences drawn from other established facts, the conviction is improper.' " However, the rule against inference-stacking "is 'extremely limited' and does not prohibit drawing parallel inferences in combination with additional facts or drawing multiple, separate inferences from the same facts."

(Citations omitted.) *Shields* at ¶ 35.

**{¶43}** The jury was not required to impermissibly stack inferences to find Howard guilty of aggravated trafficking under counts two, four, and six. Jurors could draw multiple, separate inferences from the same set of facts. Those facts included that Howard was a drug dealer who had sold drugs directly to a confidential informant. Howard sold drugs directly out of the white Ford Taurus he drove. Howard maintained larger quantities of drugs and provided smaller quantities to other dealers. Howard was repeatedly seen driving the white Ford Taurus around town. Hertzler did not have the drugs for the controlled buys and had to get them from his "dude" each time. Immediately prior to each controlled buy, Hertzler procured drugs from Howard's white Ford Taurus or from Howard's residence. Phone records showed that Hertzler and Howard had daily contact with each other during October and November 2020, the time the controlled buys occurred. A search of Howard's residence led to the discovery of scales, a money counter, and surveillance cameras, all of which are commonly used in illegal drug deals.

**{¶44}** In count two, Hertzler said he had to wait for his dude to bring the drugs to complete the transaction, a car pulled into the drive, and Hertzler said my dude is here. The jury was free to infer that the driver was Hertzler's dude. Based upon the fact that a

white Ford Taurus pulled into the drive, the jury was free to infer that the driver of the white Ford Taurus was Howard. The jury did not need to stack inferences to conclude that Howard supplied the drugs, it could use the separate facts it knew to draw parallel inferences in combination with additional facts and to draw multiple, separate inferences from the same facts. Similarly, for count four, before the controlled buy Hertzler traveled to Howard's residence, stayed for a few minutes, and then left. Immediately after leaving Howard's residence, Hertzler told the confidential informants he had the drugs and would be at the meet up location. In count six, Hertzler set up the controlled buy at a stop sign within a quarter and a half mile from Howard's residence, he took only a few minutes to arrive at the stop sign from the time he said he was on his way, and then immediately travelled to Howard's residence after the controlled buy and was back there within three minutes.

{¶45} We reject Howard's contention that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. After viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found he was a "person" selling methamphetamine without violating the rule against stacking inferences. And, after our review of the record, and after we consider the evidence and testimony adduced at trial and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence or lack thereof, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice such that Howard's convictions must be reversed and a new trial ordered.

{¶46} We overrule Howard's second and third assignments of error.

### B. Ineffective Assistance of Counsel

**{¶47}** Howard contends his trial counsel was ineffective for failing to file an indigency affidavit prior to sentencing and by failing to call Howard as a witness to testify about his inability to pay the mandatory fines. As a result, the fines could not be waived. However, Howard concedes he has a "silent record" on which to try to show prejudice, "[Howard] must demonstrate prejudice from the trial court record but how can he do so from a silent record?" In other words, Howard concedes that there is no evidence in the record that he was indigent at the time of sentencing. Therefore, there is no evidence that Howard could truthfully execute an affidavit of indigency at the time of sentencing or provide truthful testimony that he was indigent.

**{¶48}** The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord Hinton v. Alabama*, 571 U.S. 263, 272, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014) (Sixth Amendment right to counsel means "that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence"). To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *E.g., Strickland*, 466 U.S. at 687; *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 183; *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 85.   To establish prejudice, a defendant must demonstrate that a

reasonable probability exists that "but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome." *Strickland*, 466 U.S. at 694.

**{¶49}** Howard must show that (1) trial counsel's failure to file an indigency affidavit constitutes deficient performance and (2) a reasonable probability exists that the trial court would have found him to be indigent and unable to pay the mandatory fines. *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 16.

**{¶50}** Here, we cannot assume that trial counsel's failure to file an affidavit of indigency constitutes deficient performance. First, Howard had the financial ability to retain his own defense counsel, both for the first trial which ended in a mistrial and the second trial. Second, the record shows that Howard owned four vehicles and three of the vehicles, a Cadillac, a Jaguar, and Ford Taurus, were forfeited. Otherwise, the record shows no evidence concerning Howard's financial status and no evidence of indigency. "If a claim of ineffective assistance of counsel requires proof from outside of the record, then such claim is not appropriately considered on direct appeal." *State v. Savage*, 2018-Ohio-5125, 124 N.E.3d 414, ¶ 21 (7th Dist.), citing *State v. Hartman,* 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001); *State v. Cremeans*, 4th Dist. Ross No. 21CA3744, 2022-Ohio-4832, ¶ 26-27.

**{¶51}** The record here is distinguishable from a situation like the one discussed in *State v. McElfresh*, 2021-Ohio-480, 168 N.E.3d 71 (5th Dist.). In *McElfresh* the record contained evidence that the defendant had court-appointed counsel, had only $500 in savings, received Medicaid, and lived with his mother. Additionally, the trial court initially stated that it was not going to assess the mandatory fine, but then noted that no indigency

affidavit had been filed prior to sentencing and decided to assess the fine. The appellate court found that there was sufficient evidence that, had his appointed trial counsel filed an affidavit of indigency before sentencing, the trial court would have found him indigent and waived the fine. *Id.* at ¶ 10-17.

{¶52} Here there is simply no evidence that Howard was indigent. Therefore, there is no evidence in the record to support a finding that Howard's trial counsel was deficient for failing to file an affidavit of indigency. As a result, Howard has failed to establish that his trial counsel's performance was deficient. Additionally, Howard has failed to establish a reasonable probability exists that the trial court would have found him indigent and unable to pay the mandatory fines, even if his counsel had filed an affidavit of indigency. According to statements made at the sentencing hearing, contrary to viewing Howard as indigent, the trial court believed Howard had a lucrative drug trade and made considerable money through drug deals:

> The Court finds * * * that you're a significant drug dealer making money. I can tell you in the * * * 14 years on the bench, I don't think I've ever seen a money counter. You know, the only time I've ever seen money counters is in banks. And so that tells you are a huge drug dealer. So it is clear that you need to be punished and significantly. * * * as one attorney, late attorney used to say, "It pays you money and takes your chances." You took your chances and now you're going to pay.

{¶53} We overrule Howard's fourth assignment of error.

V.  CONCLUSION

{¶54} Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**