[Cite as *State v. Hertzler*, 2025-Ohio-758.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 22CA5 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| CHRISTOPHER HERTZLER, | : | |
| | : | |
| Defendant-Appellant. | : | **RELEASED: 02/25/2025** |

APPEARANCES:

Anneka Collins, Highland County Prosecutor, and Adam King, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellant.

Max Hersch, Assistant State Public Defender, Columbus, Ohio, for appellee.

Wilkin, J.

{¶1} In this appeal, Christopher Hertzler ("Hertzler") appeals his convictions in the Highland County Court of Common Pleas of nine criminal counts, including one count of engaging in a pattern of corrupt activity (Count 1) and four counts of aggravated possession of methamphetamine (Counts 3, 5, 7 and 9), four counts of aggravated trafficking in methamphetamine (Counts 6 and 8) with two of the trafficking counts included specifications, trafficking in the vicinity of a juvenile (Count 2) and trafficking in the vicinity of a school zone (Count 4). On appeal, Hertzler asserts three assignments of error.

{¶2} Hertzler's first assignment of error claims that the trial court committed plain error in not severing his trial from his co-defendant, Wesley A. Howard's trial. Hertzler filed a motion to sever, which was denied, but did not

renew his motion to sever after a mistrial was declared.  Therefore, with regard to his appeal of the trial court's denial of his motion to sever, he waived all but plain error.  Because Hertzler has not shown that having a joint trial caused him undue prejudice and because the evidence, in this case, is simple and direct, we find no plain error and agree with the trial court's conclusion not to sever Hertzler's trial from co-defendant Howard's trial.  Therefore, we overrule his first assignment of error.

{¶3} In his second assignment of error, Hertzler contends that the trial court committed plain error when it sentenced him to an indefinite prison term under the Reagan Tokes Act, which he claims is unconstitutional.  Because the Supreme Court of Ohio has held that the Reagan Tokes Act is constitutional, we overrule Hertzler's second assignment of error.

{¶4} In his third assignment of error, Hertzler claims that his trial counsel was ineffective for failing to submit an affidavit of indigency with the trial court at sentencing and request a waiver of the fine imposed on him.  Because we find that Hertzler failed to establish a reasonable probability the trial court would have found him indigent upon filing of the affidavit and seeking a waiver of his fine, we overrule Hertzler's third assignment of error.

{¶5} Accordingly, we affirm Hertzler's criminal convictions.

FACTS AND PROCEDURAL BACKGROUND

{¶6} On September 14, 2021, the Highland County Grand Jury issued an indictment charging Hertzler and his co-defendant Howard with 12 criminal counts.  On May 3, 2022, the grand jury issued a superseding indictment

charging Hertzler and Howard with 14 criminal counts.  The first seven counts were against both Hertzler and Howard and involved the same dates of criminal conduct.  The eighth and ninth counts applied to Hertzler, only, and the remaining counts were against Howard, only.  Below is a chart outlining the counts as indicted.

**Charges against both Hertzler and Howard:**

| Count | Charge | Specification | Date |
| --- | --- | --- | --- |
| 1 | Engaging in a Pattern of Corrupt Activity, R.C. 2923.32(A)(1), F1 | None | October 30, 2020 through January 1, 2021 |
| 2 | Aggravated Trafficking in Methamphetamine, R.C. 2925.03(A)(1), F2 | In the Vicinity of Juvenile | November 6, 2020 |
| 3 | Aggravated Possession of Methamphetamine, R.C. 2925.11, F3 | None | November 6, 2020 |
| 4 | Aggravated Trafficking in Methamphetamine, R.C. 2925.03(A)(1), F2 | In the Vicinity of a School Zone | November 9, 2020 |
| 5 | Aggravated Possession of Methamphetamine, R.C. 2925.11, F3 | None | November 9, 2020 |
| 6 | Aggravated Trafficking in Methamphetamine, R.C. 2925.03(A)(1), F3 | None | November 12, 2020 |
| 7 | Aggravated Possession of Methamphetamine, R.C. 2925.11, F3 | None | November 12, 2020 |

**Charges against Hertzler only:**

| Count | Charge | Specification | Date |
| --- | --- | --- | --- |
| 8 | Aggravated Trafficking in Methamphetamine, R.C. 2925.03(A)(1), F2 | In the Vicinity of Juvenile | November 16, 2020 |
| 9 | Aggravated Possession of Methamphetamine, R.C. 2925.11, F3 | None | November 16, 2020 |

**Charges against Co-Defendant Howard only:**

| Count | Charge | Specification | Date |
| --- | --- | --- | --- |
| 10 | Aggravated Trafficking in Methamphetamine, R.C. 2925.03(A)(1), F3 | None | November 1, 2020 |
| 11 | Aggravated Possession of Methamphetamine, R.C. 2925.11, F3 | None | November 1, 2020 |
| 12 | Aggravated Trafficking in Methamphetamine, R.C. 2925.03(A)(1), F3 | None | October 9,  2020 |
| 13 | Aggravated Possession of Methamphetamine, R.C. 2925.11, F3 | None | October 9,  2020 |
| 14 | Forfeiture Specification, R.C. 2923.32(B) | | |

{¶7} On December 9, 2021, Hertzler filed a motion to sever his trial from Howard's.  Hertzler argued that being tried with Howard would cause him

(Hertzler) "undue prejudice" because his guilt was "necessarily limited to the specific overt act alleged in the indictment involving him."

{¶8} The State filed a memorandum contra. The State claimed that the charges alleged in the indictment were "more than connected; one defendant is literally acting with the other defendant." The State also asserted that Hertzler failed to show how not severing his trial from Howard prejudiced him.

{¶9} On January 12, 2022, the trial court issued an entry overruling Hertzler's motion to sever. Central to its analysis, the trial court found that the indictment alleged the same course of criminal conduct pertaining to the charges against Hertzler and co-defendant Howard in Counts 1 through 7, so joinder was proper under Civ.R. 8(B). The court also found that Hertzler had not demonstrated that the joinder of his trial with Howard's would cause him any prejudice, so his motion lacked merit.

{¶10} The matter proceeded to trial in March 2022. However, on March 30, Hertzler filed a motion for a mistrial. The motion alleged that the prosecutor was handling evidence during the trial when she became ill. It was rumored that the cause of her illness was fentanyl, which was overheard by some members of the jury. The trial court held a hearing on the motion for mistrial. After some discussion, the court granted the motion and declared a mistrial without prejudice.

{¶11} At the mistrial hearing, Hertzler's privately retained counsel moved the court to provide Hertzler with a court-appointed attorney because Hertzler did not have the funds to continue paying for private representation. After the court

dismissed the jury, it then addressed Hertzler's request for a court-appointed attorney and advised him to fill out a financial disclosure form.  When the court asked Hertzler if he was employed, he responded that he was employed working "construction" "under the table."  He also stated that he was getting a job with Amazon.  The trial court issued an order granting a mistrial, and set a new trial date.

{¶12} Hertzler filled out a financial disclosure form indicating that he was employed with "Chiefs Lake[,]" but he did not indicate the type of work that he did there.  He also did not mention that he was employed anywhere else. The court ultimately appointed counsel to represent Hertzler in this matter.

{¶13} On August 22, 2022, Hertzler and Howard's joint trial commenced and during the prosecutor's opening statement she indicated that "[t]he testimony and evidence will make it clear that on at least three separate dates, November the 6th, November the 9th, and November the 12th, Howard supplied Hertzler with methamphetamine and Hertzler sold the methamphetamine to undercover civilians who were working with law enforcement."  She also claimed that the evidence would show that on October 9 and November 1, 2020, Howard sold methamphetamine to confidential informants without assistance from Hertzler. And finally, she maintained that the evidence would show that on November 16, 2020, Hertzler sold methamphetamine to confidential informants without assistance from Howard.

{¶14} The State's first witness was Hillsboro Police Officer Brian Butler. Officer Butler testified that he worked with Investigator Randy Sanders of the

Highland County Prosecutor's Office in covert drug operations, using confidential informants to make controlled drug buys.

{¶15} Officer Butler testified that on November 6, 2020, he assisted in a controlled drug buy using two confidential informants at Hertzler's residence. The confidential informants had hidden audio and video recording devices and Officer Butler monitored the transaction through the devices as well as visually from his vehicle. While the two confidential informants were in Hertzler's house, a white Taurus with a black grill cover, tinted windows, and a tinted license plate cover that Officer Butler recognized as belonging to Howard, pulled into Hertzler's driveway. When the Taurus pulled into the driveway, Butler testified that on the audio/video recording of the November 6, 2020, drug buy, Hertzler made a statement that "his dude was coming." After the transaction concluded, the confidential informants left Hertzler's residence and met with Officer Butler. Audio and video recordings from that buy were played for the jury.

{¶16} Next Officer Butler discussed a controlled drug buy on November 9, 2020, that occurred in the parking lot of a fast-food restaurant located in Hillsboro, Ohio. He again provided surveillance for the controlled buy. One of the confidential informants was communicating with Hertzler about purchasing the drugs. Officer Butler testified that he positively identified Hertzler as arriving at the fast food restaurant on November 9, 2020, driving in a "light-colored Mercury." Officer Butler testified that he never saw Howard during the November 9th buy, but he did see his white Taurus. He stated that the "[drug] deal was over shortly" after Hertzler arrived. Officer Butler then met the confidential

informant and recovered the drugs that had been sold to the confidential informant by Hertzler. The audio and video of this deal was also recorded by Officer Butler.

**{¶17}** Finally, Officer Butler testified that on November 16, 2020, Hertzler, acting alone, sold methamphetamine to Rebecca South and her husband, two of the State's confidential informants.

**{¶18}** The State also presented Miller J. Baldwin as a witness, who testified that he had a past criminal history involving felonies, but he now works with law enforcement to make controlled drug buys. Baldwin testified that he was involved in a controlled drug buy on October 9, 2020, involving Stephen Debo and Howard. He claimed that Debo and Howard arrived in a Jaguar and Howard was driving. Debo got out of the car and handed Baldwin the drugs.

**{¶19}** The State's next witness was Stephen Debo, who testified that he pleaded guilty to trafficking in methamphetamine, and, in exchange for his guilty plea, he agreed to give testimony about Howard. Debo testified that he was involved in a drug transaction on October 9, 2020, with Baldwin, in which Baldwin wanted to purchase a quantity of methamphetamine that Debo did not have. Consequently, Debo contacted Howard because he (Debo) "didn't have access to anything like that, [Howard] did. [Howard] had the bulk amount." Debo asserted that he accompanied Howard to the sale because Howard had larger quantities of drugs and Debo was also working off a debt he owed Howard for crack that Debo had purchased from Howard. Debo also testified that Howard was the one who determined the price to charge for the drugs.

{¶20} The State also called Rebecca South as a witness. She testified that she was a previous drug user, but had never been convicted of a felony or a crime involving dishonesty, and she had been drug-free for approximately two years. South stated that about two years ago, she became involved as an undercover drug buyer and confidential informant, working with Investigator Randy Sanders of the Highland County Prosecutor's Office and other law enforcement organizations. South testified that she was involved in setting up a controlled drug buy with Howard in November 2020. She knew Howard from school. She texted Howard to arrange a purchase of methamphetamine. South testified that on November 1, 2020, she met Howard in the Kroger parking lot and purchased methamphetamine from him. The transaction was recorded on audio. Howard arrived in the parking lot in a white Taurus, with darkly tinted windows and a darkly tinted license plate cover, with a black grill cover on the front. South entered Howard's car talking with Howard for approximately 15 minutes during the transaction. On the audio tape, South clearly recites the license plate number of Howard's car for law enforcement.

{¶21} South testified that she was also involved in the November 6, 2020 controlled drug buy, which she and her husband arranged with Investigator Sanders. The drugs were to be bought from Hertzler at his house. The buy was recorded on audio and video. South testified that she and her husband went inside Hertzler's residence to make the purchase. South said that at some point they had to go back outside and move their car so that Hertzler's "guy could pull in." When a car pulled in, Hertzler asked South and her husband for the money

for the drugs. South testified that the car that pulled into Hertzler's drive was Howard's. It was the same white Taurus that Howard drove to the controlled drug buy that South made in the Kroger parking lot five days earlier. South also testified that she had seen the car several times around town and each time she saw it, Howard was the driver and she saw him get out of it at various stores around town. South testified that Hertzler went outside to "get the dope from his guy." South testified that when they saw the white Taurus pull in, Hertzler said, "my dude is here, I'll be back." After the buy concluded, South and her husband met up with Investigator Sanders and went through the usual post-controlled buy procedures.

{¶22} South testified that she was also involved in the controlled drug buy on November 12, 2020, but she did not testify about the November 9, 2020 purchase. The November 12th controlled buy was also recorded on audio and video. South and her husband texted Hertzler and Hertzler replied with a pin drop location on Hill Road where he wanted to meet them. South testified that she and her husband drove to the location, which was a stop sign "in the middle of nowhere." Hertzler told South and her husband that he was at Hickory Trails. When Hertzler arrived, South's husband got into Hertzler's car and made the purchase. Thereafter, South and her husband met up with Investigator Sanders and went through the post-controlled buy procedures.

{¶23} The State also presented Investigator Randy Sanders of the Highland County Prosecutor's Office as a witness. He testified that he has been

in law enforcement for 40 years, served on several major drug crime task forces, and has specialized training in illegal narcotic investigations.

{¶24} Investigator Sanders arranged a controlled buy wherein Baldwin purchased methamphetamine from Debo on October 9, 2020. Immediately after the drug transaction, Sanders witnessed Howard and Debo meet up at a gas station parking lot. Howard drove up in his Jaguar and parked next to Debo's truck. Both men got outside of their vehicles, then both got back inside their vehicles and drove off. Investigator Sanders and another law enforcement official in a separate vehicle followed Howard in the Jaguar and saw it had driven to and parked in front of Howard's residence on Woodland Trail.

{¶25} Investigator Sanders heard South read off the license plate of the white Taurus that Howard drove to meet her at the November 1, 2020 buy and the vehicle was registered to Howard's mother.

{¶26} Investigator Sanders testified that he was involved with the November 6, 2020 controlled drug buy that occurred at Hertzler's residence. Sanders monitored that buy from his vehicle, which was parked at a fast food restaurant near Hertzler's home. He watched South and her husband enter Hertzler's residence and could hear the audio as the transaction occurred. Investigator Sanders saw Howard's white Taurus pull into Hertzler's driveway, and he heard Hertzler say "his dude was there," which means the person providing the dope. Howard's vehicle arrived at approximately 5:27 p.m. and was there for approximately five minutes, leaving at approximately 5:32 p.m. South and her husband concluded the purchase and left at about 5:37 p.m.

Thereafter they met with Investigator Sanders and went through the standard post-controlled buy procedures.

**{¶27}** Investigator Sanders also worked with South's husband on the November 9, 2020 controlled drug buy that occurred at a fast food restaurant parking lot. Investigator Sanders was watching Hertzler's residence and learned through other surveillance officers monitoring the November 9th buy that Hertzler said it was going to be 40 minutes before he would be at the fast food parking lot. Investigator Sanders decided to drive to Howard's house on Woodland Trail to see if Hertzler was getting his drugs from Howard. He came across Hertzler driving that way so he followed Hertzler and saw that Hertzler parked Howard's driveway. A few minutes later, Investigator Sanders heard from the other surveillance officer that Hertzler had reported that he had the dope and was on his way to the restaurant. Investigator Sanders followed Hertzler back from Howard's residence and saw him go to the fast food restaurant parking lot and meet up with South's husband to make the drug deal.

**{¶28}** Investigator Sanders was involved in the November 12, 2020 controlled drug buy. He prepared the Souths before the buy and performed post-controlled drug buy procedures after the transaction. This transaction took place at the Rocky Fork Lake area on Hickory Trail based on a pin drop that Hertzler provided to the Souths. Sanders followed the Souths until they turned off on Hickory Trail and monitored them via contemporaneous audio recording. After the deal was completed, Sanders drove past Howard's residence on Woodland Trail and saw Hertzler's car parked at Howard's residence. Howard's residence

was approximately a quarter to a half mile from the stop sign location for the drug transaction. Prior to the deal, Hertzler told the Souths he was on his way and arrived a few minutes later. After the deal was completed, Hertzler was back at Howard's residence within three minutes.

{¶29} Investigator Sanders also testified that he was part of a law enforcement team that executed a search warrant on Howard's residence on Woodland Trail in September 2021, approximately a year after the October and November 2020 controlled drug buys. Law enforcement had to break into the house because Howard, who was inside, did not respond to their knocking. It took law enforcement 10 to 15 minutes to access the interior of the residence after they knocked and announced their presence. During the search, law enforcement found scales, a safe and two lockboxes with $1,100, a money counter, several spiral notebooks with names and numbers, and surveillance cameras on the exterior and interior areas of the residence. Investigator Sanders testified that scales are commonly used to weigh drugs, a money counter is often used by drug dealers who handle large sums of money, notebooks are used to keep track of people who owe money for drugs, and surveillance cameras are used by drug dealers to monitor who is at the door and what is going on before letting people inside.

{¶30} Investigator Sanders testified that they did not find methamphetamine or the marked money used in the October and November 2020 controlled drug buys during the search, but he was not surprised. Investigator Sanders testified that it is common for dealers to hide their drugs

elsewhere. And, Investigator Sanders believed that during the 10 to 15 minutes it took them to access the interior of the residence, Howard disposed of the drugs down the toilet. There was an empty large plastic baggy on the floor in the bathroom and Howard was in the bathroom. Investigator Sanders was not surprised to find none of the marked money from the earlier October and November 2020 drug buys because of the amount of time that had passed between those transactions and the search of Howard's residence. Investigator Sanders also testified that he reviewed phone records between Howard and Hertzler and found almost daily communication between the two during the October and November 2020 time frame.

{¶31} After the trial court instructed the jury on the law, the jury retired to deliberate. The jury found Hertzler guilty on all counts set forth in the superseding indictment.

{¶32} The court merged the four counts of aggravated trafficking in methamphetamine with the four counts of possession of methamphetamine for purposes of sentencing. The State elected for the court to sentence Hertzler on four counts of aggravated trafficking in methamphetamine.

{¶33} After brief arguments by counsel, the court proceeded to sentence the defendants. The court then sentenced Hertzler as follows: (1) Count 1 (engaging in a pattern of corrupt activity), 8 to 12 years in prison; (2) Count 2 (aggravated trafficking in methamphetamine in the vicinity of a juvenile), 3 years in prison; (3) Count 4 (aggravated trafficking in methamphetamine in the vicinity of a school), 3 years in prison; (4) count 6 (aggravated trafficking in

methamphetamine), 18 months in prison; and (5) Count 8 (aggravated trafficking in methamphetamine), 18 months in prison.  These prison terms were to be served consecutive to each other for an aggregate prison sentence of 17 to 21 years.  The Court also ordered Hertzler to pay a $30,000 fine.

**{¶34}** After the court completed its sentencing of both defendants, it asked if there was anything else, and Hertzler's counsel stated: "Your honor, Mr. Wagoner and myself are appointed to represent Mr. Hertzler.  I'm not sure if his financial status has changed with respect to the fines."  The court responded: "Okay, well, we'll see about that in the future."  It is this judgment that Hertzler appeals.

ASSIGNMENTS OF ERROR

I.      THE TRIAL COURT PLAINLY ERRED WHEN IT DID NOT SEVER MR. HERTZLER'S TRIAL FROM MR. HOWARD'S.

II.     THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SENTENCED MR. HERTZLER TO AN INDEFINITE SENTENCE UNDER THE UNCONSTITUTIONAL REAGAN TOKES ACT.

III.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO SUBMIT AN AFFIDAVIT OF INDIGENCY AT SENTENCING AND REQUEST THE WAIVER OF MANDATORY FINES.

I. First Assignment of Error

**{¶35}** Hertzler argues that the trial court plainly erred when it denied his motion to sever his trial from Howard's.  He claims that the error was obvious and there is a reasonable probability that, but for that error, the outcome of his trial would have been different.

**{¶36}** Hertzler first claims that the State cannot satisfy the other acts test to show that evidence against Howard would be admissible in Hertzler's trial, if he had been tried alone. Hertzler claims that evidence of Howard's October 9, 2020 and November 1, 2020 methamphetamine sales, and the "overwhelming physical evidence of guilty in [Howard's] home -- was not relevant to any material fact in dispute in any of the charges against Mr. Hertzler." Therefore, the other-acts-evidence test did not support joinder of Hertzler and Howard's trials.

**{¶37}** Next Hertzler argues that the evidence in this case was not simple and direct. He claims the overwhelming evidence against Howard created a danger that the jury would consider the evidence of Howard's offenses as "corroborative" of Hertzler's offenses.

**{¶38}** Hertzler further argues that the evidence against Howard had a reasonable probability of "spilling over" against Hertzler and changing the outcome of his trial. Hertzler argues that because the State alleged that he and Howard were working together, evidence that Howard was "operating an even greater drug-selling operation carried the risk of confusing the issues and leading the jury to find Mr. Hertzler guilty based on irrelevant evidence." Unlike Howard's case, which included overwhelming physical evidence found in his home, there is no comparable level of physical evidence against Hertzler.

**{¶39}** In response, the State maintains that typically a motion to sever will not be disturbed absent an abuse of the trial court's discretion. However, in this case, because Hertzler did not renew his motion to sever after the mistrial was

granted, he must establish that it was plain error that his trial was not severed from Howard's.

{¶40} The State notes that the law favors joinder of defendants for trial because it conserves resources. The State further claims that joinder does not result in prejudice where the evidence is "simple and direct[,]" as it is in this case. Quoting the Supreme Court of Ohio in *State v. Schiebel*, 2005-Ohio-3310, ¶ 44, the State also asserts that "joinder of defendants is proper so long as all defendants participated in the same series of transactions leading to the charges even though not all defendants participated in every act."

{¶41} The State argues that the trial court did not commit plain error when it rejected Hertzler's motion to sever his trial from Howard's. The State further claims the evidence in this case was simple and direct resulting in the jury being able to segregate the proof for each offense; thus, causing Hertzler no undue prejudice. Therefore, the State urges this court to overrule Hertzler's first assignment of error.

### A. Law

### 1. Standard of Review

{¶42} Generally, a court of appeals reviews a trial court's denial of a motion for severance for abuse of discretion. *State v. Lott,* 51 Ohio St.3d 160, 163 (1990); *State v. Evans*, 2012-Ohio-1562, ¶ 35 (4th Dist.). An abuse of discretion is more than an error or judgment but, rather, implies that the court's determination was unreasonable, arbitrary or unconscionable. *State v. Adams,* 62 Ohio St.2d 151, 157 (1980). However, if a defendant, as Hertzler did herein,

fails to renew a motion to sever after a mistrial is declared, he or she forfeits all

but plain error review of the trial court's conclusion not to sever the trials. *State*

*v. Howard*, 2024-Ohio-1409, ¶ 25 (4th Dist.).

> [P]lain error under Crim.R. 52(B) is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. See *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus. More important, to find plain error we must be able to say that, but for the error, the outcome of the trial would have been otherwise. *Id.* at paragraph two of the syllabus[.]

*State v. Smith*, 2009-Ohio-4539, ¶ 28 (4th Dist.), citing *State v. Braden,* 2003-Ohio-1325, ¶ 50.

2. Joinder

**{¶43}** Crim.R. 8(A), states:

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal.

"[J]oinder of defendants is proper so long as all defendants participated in the

same series of transactions leading to the charges even though not all

defendants participated in every act." *State v. Schiebel*, 55 Ohio St.3d 71, 88

(1990), citing *United States v. Burreson*, 643 F.2d 1344, 1347 (9th Cir. 1981).

Not all defendants need to be charged in each count. *Id.*, citing *United States v.*

*Amick*, 439 F.2d 351, 360 (7th Cir. 1971).

**{¶44}** Joining of trials is favored in the law for many reasons. For example,

"[j]oinder conserves judicial and prosecutorial time, lessens the not

inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225 (1980).

### 3. Severance

**{¶45}** Crim.R. 14 provides relief from joinder "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses or of defendants." " 'A defendant must show clear, manifest and undue prejudice and violation of a substantive right resulting from failure to sever.' " *State v. Sims*, 2023-Ohio-1179, ¶38, (4th Dist.), quoting *Schiebel* at ¶ 54, quoting *United States v. Castro*, 887 F.2d 988, 996 (9th Cir. 1989). Undue prejudice is " ' "that quality of evidence which might result in an improper basis for a jury decision." ' " *Susanu v. Cliche*, 143 Ohio App. 3d 776, 778-779 (8th Dist. 2001), quoting *Oberlin v. Akron Gen. Med. Ctr.*, 2001-Ohio-248, 91 Ohio St.3d 169, 173, quoting Weissenberger's Ohio Evidence (2000), 85-87, Section 403.3. A " 'manifest error' [is] '[a]n error that is *plain and indisputable.*' " (Second brackets sic., Emphasis sic.) *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716, ¶ 20, quoting *Black's Law Dictionary* (10th Ed.2014). Courts have recognized a litigant's substantive rights, includes the right to a fair trial. *See State v. Wright*, 1996 WL 355302, * 5 (8th Dist. June 27, 1996); *State v. Smith*, 2016-Ohio-7390, ¶ 56 (5th Dist.).

**{¶46}** Undue prejudice can result from "spill over[,]" which is when evidence introduced against one defendant spills over and is improperly considered by the jury against a co-defendant. *State v. Payne*, 2003-Ohio-4891,

¶ 28 (10th Dist.).  "In every trial where defendants are tried jointly, there is a risk that information introduced against one of the co-defendants may spill over against the other defendant."  *State v. Jewett*, 2013-Ohio-1246, ¶ 46 (5th Dist.), citing *State v. Wilkerson,* 2002-Ohio-5416, ¶ 41 (10th Dist.). "The primary concern [with spill over] is whether the jury will be able to segregate the evidence applicable to each defendant[.]"  *State v. Lloyd*, 2015-Ohio-2435, ¶ 16 (5th Dist.), citing *Opper v. United States*, 348 U.S. 84, 95 (1954).

{¶47} Even "when the risk of prejudice is high [due to joinder] . . . less drastic measures [than severing trials], such as limiting instructions, often will suffice to cure any risk of prejudice."  *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  This court has recognized that "any prejudice that may result from the joinder of offenses is minimized when a trial court cautions a jury before deliberations to consider each count, and the evidence applicable to each count, separately, and to state its findings as to each count uninfluenced by its verdict on any other counts.  *State v. Freeland*, 2015-Ohio-3410, ¶ 16 (4th Dist.).

{¶48} Moreover,

> [i]f a defendant presents sufficient information to show that joining offenses for trial will prejudice the defendant's rights, the state can overcome the defendant's claim of prejudicial joinder by showing either: (1) the state could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B) (the other-acts test); or (2) the "evidence of each crime joined at trial is simple and direct" (the joinder test).

*Sims*, 2023-Ohio-1179, at ¶ 39 (4th Dist.), citing *Lott*, 51 Ohio St.3d 160, 163 (1990).

{¶49} " ' "The two tests are disjunctive, so that the satisfaction of one negates a defendant's claim of prejudice without consideration of the other." ' "

*Id.*, quoting State *v. Wright*, 2017-Ohio-8702, ¶ 51 (4th Dist.), quoting *State v.*

*Sullivan*, 2011-Ohio-6384, ¶ 23 (10th Dist.).  Accordingly, " '[i]f the state can meet

the joinder test, it need not meet the stricter 'other acts' test.' "  *State v. Johnson*,

88 Ohio St.3d 95, 109 (2000), quoting *State v. Franklin*, 62 Ohio St.3d 118, 122

(1991).

> Evidence of joined offenses is simple and direct when (1) the jury is capable of readily separating the proof required for each offense; (2) the evidence is unlikely to confuse the jurors, (3) the evidence is straightforward and easy to understand; (4) the offenses involve different victims, different incidents, and different witnesses; and (5) little danger exists that the jury would improperly consider testimony on one offense as corroborative of the other.

*Sims* at ¶ 40, citing *State v. Freeland*, 2015-Ohio-3410, ¶ 14 (4th Dist.).

{¶50} Simple and direct evidence aids a jury in properly segregating the

evidence.  *State v. Kuck*, 2016-Ohio-8512, ¶ 43 (2d Dist.).  A "jury is believed

capable of segregating the proof on multiple charges when the evidence as to

each of the charges is uncomplicated."  *State v. Brooks*, 44 Ohio St.3d 185, 193

(1989), citing *State v. Roberts,* 62 Ohio St.2d 170, 175 (1980).

### B. Analysis

{¶51} Hertzler maintains that because Howard was "operating an even

greater drug-selling operation carried the risk of confusing the issues and leading

the jury to find Hertzler guilty based on irrelevant evidence."  He further claims

that the "overwhelming physical evidence found in [Howard's] home and the

proceeds of his drug sales" will spill over and prejudice Hertzler against which the

State has "no comparable level of physical evidence against Mr. Hertzler."

Hertzler also claims that the evidence in his case is not simple and direct.

### 1. Hertzler and Howard Trafficked Methamphetamine in the Same Series of Transactions

**{¶52}** As the evidence showed, Hertzler and Howard "participated in the

same series of transactions leading to the charges" as alleged in Counts 2

through 7 by trafficking methamphetamine. Howard supplied methamphetamine

to Hertzler, and Hertzler, in turn, sold it to the State's confidential informants.

The State also charged Hertzler and Howard individually in other counts in the

indictment, but joinder does not mandate that all defendants need to be charged

in each count. Counts 2 through 7 supported charging both Hertzler and Howard

with engaging in a pattern of criminal conduct as alleged in Count 1. Therefore,

we agree with the trial court that joinder of their trials was "proper" under

*Schiebel*.

### 2. Hertzler Showed No Prejudice and The Evidence was Simple and Direct

**{¶53}** We also find that Hertzler has failed to demonstrate that not

severing his trial from Howard's caused Hertzler clear, manifest and undue

prejudice that violated his right to a fair trial. Moreover, we find that the State met

its burden to overcome any claim of prejudice by demonstrating that the evidence

of each crime joined is simple and direct. *Sims*, at ¶ 40

#### a. The Evidence

**{¶54}** Officer Butler and Investigator Sanders testified that they set up six

controlled buys where confidential informants - Rebecca South, South's

husband, and M.J. Baldwin ("CIs") - purchased methamphetamine from the

defendants. Officer Butler and Investigator Sanders monitored the controlled buys as they occurred.  They took photographs as well as recorded audio and video of the controlled buys.

{¶55} The State's evidence showed that the six controlled buys occurred on October 9th, and on November 1st, 6th, 9th, 12th, and 16th, 2020.  As set out below, the State's evidence explained exactly what Howard and Hertzler did to possess/traffic methamphetamine during these six controlled buys.

Counts 2-7

{¶56} The State's evidence showed that regarding the November 6th, 9th, and 12th controlled buys, Howard and Hertzler worked together, with Howard *supplying* methamphetamine to Hertzler, and Hertzler then *selling* it to the CIs.

Counts 8-9

{¶57} The State's evidence showed that with regard to the November 16th controlled buy, Hertzler, acting alone, *sold* methamphetamine to CIs.

Counts 10-13

{¶58} The State's evidence with regard to the October 9th controlled buy, showed that Howard supplied methamphetamine to Steve Debo, who then sold it to Baldwin, the CI.  Finally, the State's evidence with regard to the November 1st controlled buy showed that Howard *sold* methamphetamine to a CI.

{¶59} As demonstrated in our breakdown of the evidence above, we agree with the trial court that the evidence presented by the State in this case is simple and direct.  Each drug buy was a discrete event on a particular day that was completed in minutes with the exchange of money for methamphetamine.  Thus,

the jury was able to segregate the evidence and offender for each offense

alleged.  This methodical presentation of the evidence helped to avert any

spillover of evidence from one defendant to the other and permitted the jury to

properly segregate the evidence.

b. The Jury Instructions

{¶60} After the parties rested, but, prior to closing arguments, the court

instructed the jury on the law.  We find several passages from these instructions

probative in determining whether or not failing to sever Hertzler's trial was plain

error.

{¶61} The court informed the jury that the even-numbered-aggravated-

trafficking counts (2-12) and the odd-numbered-aggravated-possession counts

(3-13) "are alternative counts and not cumulative [counts]."

{¶62} The court instructed the jury that in counts 1-7, (count 1: engaging in

a pattern of corrupt activity; counts 2-7: the possession/trafficking), the State

charged the defendants jointly.  The court also instructed the jury that for Counts

8 and 9, the State charged Hertzler only.  Finally, the court instructed the jury that

in Counts 10 through 13, the State charged Howard only.

{¶63} The court concluded its instructions by stating:

> [A]s to each count, as to each Defendant, if you find all of the
> essential elements of the offense has [sic.] been committed by
> that Defendant as charged in the that count of the indictment you
> must return a verdict of guilty.  If you find that any one or more of
> the essential elements have not been proven as to that count, as
> to that Defendant, your verdict has to be not guilty.  Now, you'll
> decide the question of guilt or innocence of each of the two
> Defendants and you'll consider the evidence applicable to each of
> them as though they were being separately tried.

**{¶64}** Although this case involved 14 criminal counts, 7 of which were charged against the defendants jointly, the trial court instructed the jury that they had to evaluate the charges against each defendant independently from the other defendant. We find that these instructions, when considered with the evidence presented, prevented spillover, and "[j]uries are presumed to follow the instructions that they are given." *State v. Martin*, 2005-Ohio-1732, ¶ 40 (4th Dist.). Aside from speculation, Hertzler offers no reason why the jury would not have followed these instructions.

**{¶65}** We find that Hertzler has failed to show that he suffered clear, manifest and undue prejudice by not having his trial severed. Rather, we agree with the trial court that the evidence in this case is simple and direct and that the trial court's instructions prevented spillover of evidence by the jury from one defendant to the other. Therefore, we find no prejudice or manifest miscarriage of justice that would justify finding that not severing Hertzler's trial from Howard's was plain error. Accordingly, we overrule Hertzler's first assignment of error.

## II. Second Assignment of Error

**{¶66}** In his second assignment of error, Hertzler asserts that the trial court committed plain error by imposing upon him an indefinite prison sentence under the Reagan Tokes Act ("RTA"), which he claims is unconstitutional. Hertzler asserts that the RTA is unconstitutional because it violates the separation of powers doctrine, violates due process, and violates a defendant's right to a trial by jury.

**{¶67}** In response, the State argues that Hertzler failed to challenge the constitutionality of Reagan Tokes in the trial court so we cannot find RTA unconstitutional absent plain error. The State also points out that this court has rejected that the RTA violates separation of powers doctrine in *State v. Bontrager*, 2022-Ohio-1367, ¶ 41-44, due process in *State v. Alexander*, 2020-Ohio-1812 (4th Dist.), or a defendant's right to a jury trial in *State v. Chapman*, 2022-Ohio-2853, ¶ 77 (4th Dist.).

Law and Analysis

**{¶68}** "As an intermediate appellate court, we are obligated to follow the Ohio Supreme Court's controlling authority." *State v. Stodgel*, 2024-Ohio-5182, ¶ 65 (4th Dist.). On January 23, 2023, the Supreme Court of Ohio issued an opinion in *State v. Hacker*, 2023-Ohio-2535, that held that the RTA was constitutional, rejecting arguments that it violated the separation of powers doctrine, a defendant's due process rights, and a defendant's right to a jury trial. These are the very arguments that Hertzler makes in support of his second assignment of error asserting that the RTA is unconstitutional. Pursuant to *Hacker*, we reject Hertzler's arguments that the RTA is unconstitutional, and overrule his second assignment of error.

III. Third Assignment of Error

**{¶69}** In his third assignment of error, Hertzler maintains that his trial counsel was ineffective for not submitting an affidavit of indigency at sentencing and requesting a waiver of his mandatory fine.

**{¶70** Hertzler acknowledges that under R.C. 2929.18(B)(1), a court must impose fines pertaining to certain felony drug offenses.  However, he maintains that a defendant can challenge such a fine by filing an affidavit with the court at sentencing that asserts that the affiant is indigent and unable to pay the fine.  If the court agrees, then pursuant to R.C. 2929.18(B)(1), the court "shall not impose the mandatory fine."  He claims that some courts have held that a failure to file an affidavit of indigency can constitute prejudice.

**{¶71}** Hertzler claims that there would have been a reasonable probability that the trial court would have found him indigent and waived his fine if his counsel had filed an affidavit of indigency because the record shows that due to his indigency, the trial court appointed Hertzler appellate counsel within one week of sentencing.  Further, according to Hertzler the trial court "showed an open mind to waiving the mandatory fines" because it told him 'we'll see about that in the future' " when discussing his financial status.  Finally, Hertzler asserts that he filed no tax returns from 2018 through 2020.

**{¶72}** In response, the State argues this court must determine whether Hertzler's counsel's failure to file an affidavit of indigency caused him prejudice. The State maintains that the filing of an affidavit of indigency is not necessarily conclusive evidence of ineffective assistance of counsel for failing to seek the waiver of the defendant's fines.  A defendant must show that he or she is indigent and cannot pay the fine.

**{¶73}** The State maintains that there is no reasonable probability that the court would have waived Hertzler's fine.  The State points out that Hertzler

retained counsel for the first trial that ended in a mistrial.  After the mistrial,

Hertzler stated that he was working "under the table" in construction and "was

getting a job with Amazon."  Consequently, while Hertzler may have qualified for

court-appointed counsel for his re-trial, "the record contains scant information

concerning his financial status."

{¶74} Therefore, the State argues Hertzler has failed to show that there is

a reasonable probability that except for his trial counsel's failure to file an affidavit

of indigency and seek waiver of his fine, the trial court would have waived the

fine.  Thus, the State claims that Hertzler's trial counsel was not ineffective, and

urges this court to overrule his third assignment of error.

A. Law

{¶75} To prove ineffective assistance of counsel, a petitioner "must show

(1) deficient performance by counsel, i.e., performance falling below an objective

standard of reasonable representation, and (2) prejudice, i.e., a reasonable

probability that, but for counsel's errors, the proceeding's result would have been

different."  *State v. Short*, 2011-Ohio-3641, ¶ 113 (4th Dist.), citing *Strickland v.

Washington*, 466 U.S. 668, 687-688 (1984).  "Failure to establish either element

is fatal to the claim."  *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.).

{¶76} "In Ohio a properly licensed attorney is presumed competent."

*State v. Ruble*, 2017-Ohio-7259, ¶ 47 (4th Dist.), citing *State v. Gondor*, 2006-

Ohio-6679, ¶ 62.  Therefore, Hertzler has the burden of proving that his trial

counsel was ineffective.  *Id.*  " 'In order to overcome this presumption, the

petitioner must submit sufficient operative facts or evidentiary documents that

demonstrate that the petitioner was prejudiced by the ineffective assistance.' "

*State v. Avery*, 2024-Ohio-3094, ¶ 17, quoting *Gondor* at ¶ 62. "To demonstrate

prejudice, [Hertzler] 'must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome.' " *Id.*, quoting *Strickland* at 694.

{¶77} R.C. 2929.18(B)(1) states:

> For a first, second, or third degree felony violation of any provision
> of Chapter 2925 * * * the sentencing court shall impose upon the
> offender a mandatory fine * * *. If an offender alleges in an affidavit
> filed with the court prior to sentencing that the offender is indigent
> and unable to pay the mandatory fine and if the court determines
> the offender is an indigent person and is unable to pay the
> mandatory fine described in this division, the court shall not
> impose the mandatory fine upon the offender.

{¶78} To show trial counsel is ineffective for failing to file an affidavit of

indigency and failing to seek waiver of a mandatory fine, a defendant must show:

"(1) counsel's failure to file an affidavit constitutes deficient performance; and (2)

a reasonable probability exists that the trial court would have found the defendant

to be indigent and unable to pay the mandatory fine." *State v. Malone*, 2022-

Ohio-1409, ¶19 (4th Dist.), citing *State v. Davis*, 2020-Ohio-309, ¶ 16.

{¶79} " '[A] determination of indigency alone does not rise to the level of

creating a reasonable probability that the trial court would have' found the

defendant unable to pay a mandatory fine." *Id.* at ¶ 21, quoting *Davis* at ¶ 15.

Therefore, "a trial court's determination that a defendant is indigent for purposes

of appointing counsel does not preclude the court from determining that a

defendant has the ability to pay a mandatory fine." *Id.*, citing *State v. Nitsche*, 2016-Ohio-3170, ¶ 76 (8th Dist.); *State v. Palmison*, 2002-Ohio-2900, ¶ 25 ( 9th Dist.). "[T]he burden is upon the offender to affirmatively demonstrate that he or she is indigent and is unable to pay the mandatory fine." *State v. Gipson*, 80 Ohio St.3d 626, 635 (1998).

**{¶80}** In determining whether an offender is indigent and unable to pay a mandatory fine, a court should not limit its inquiry to the offender's circumstances "at the moment of sentencing." *Malone* at ¶ 20, quoting *Gipson* at 636. "Instead, the court 'can (and should) [consider the offender's] future ability to pay.' " (Brackets and parentheses sic.) *Id.*

B. Analysis

**{¶81}** Hertzler maintains that there was a reasonable probability that the trial court would have found him indigent for purposes of waiving his fine if his trial counsel had filed an affidavit of indigency for three reasons: (1) the trial court appointed appellate counsel within a week of his sentencing based on Hertzler's affidavit of indigency; (2) while discussing Hertzler's "financial status[,]" the trial court "showed an open mind to waiving the mandatory fine by saying 'we'll see about that in the future[;]' " and (3) Hertzler was not employed in 2018 through 2020 as supported by his failure to file tax returns during those three years. [Brief, 24] We will address each argument in order.

**{¶82}** Hertzler was represented at trial by court-appointed counsel. After he filed his notice of appeal, the court appointed a public defender to represent him on appeal. However, finding a defendant indigent for the purposes of

appointing him or her counsel, is not dispositive of whether the defendant has the ability to pay his fine. *Malone*, 2022-Ohio-1409, at ¶ 21 (4th Dist.).

{¶83} Hertzler also claims that because he did not file tax returns from 2018 to 2020, he was not employed at the time. Even if Hertzler was unemployed from 2018 through 2020, that information has little probative value in determining whether the trial court would have waived Hertzler's fine if he had filed an affidavit of indigency. Our focus is on his current and future ability to pay the fine. At the March 30, 2020 hearing, Hertzler informed the trial court that he was working in construction "under the table[,]" and was getting a job at Amazon. Hertzler has been employed and offers no reason that he cannot be gainfully employed in the future. There is nothing in the record that indicates that Hertzler's ability to work has changed.[1]

{¶84} Finally, at the sentencing hearing, one of Hertzler's attorneys stated to the judge: "I'm not sure if [Hertzler's] financial status has changed with respect to the fines." The Court responded: "Okay, well, we'll see about that in the future." We do not inevitably interpret the court's statement as necessarily communicating the court's willingness to waive the fine, but rather that the waiver of the fine can be addressed in the future. This court has recognized that:

> [b]ecause information regarding an accused's financial status is typically outside the record on appeal, particularly where the defendant did not file a timely affidavit of indigency and claim an

---

[1] A presentence investigation ("PSI") may include "information reflecting [an appellant's] age, health, education, and employment status." *State v. West*, 2022-Ohio-4069, ¶28 (3rd Dist.). There is no PSI in the record, and it is likely that no PSI was requested because after the verdict, the court immediately proceeded to sentence Hertzler.

.

inability to pay any fine in the trial court proceedings, "the more appropriate vehicle for pursuing that issue is post-conviction relief proceedings filed pursuant to R.C. 2953.21" rather than direct appeal from the sentence.

*State v. Fisher*, 2018-Ohio-2718, ¶ 34 (4th Dist.), quoting *State v. Hicks*, 2010-Ohio-5521, ¶ 16 (2d Dist.).

**{¶85}** In his brief, even Hertzler admits there is scant information regarding his financial status in the record, so the more appropriate vehicle for pursuing a waiver of the fine is to file a post-conviction petition in the future.

**{¶86}** We find that Hertzler has failed to establish a reasonable probability that the trial court would have found him indigent and unable to pay the fine even if his trial counsel had filed an affidavit of indigency. Absent prejudice, Hertzler has no viable ineffective assistance claim against his counsel for failing to file an affidavit of indigency. Therefore, we overrule Hertzler's third assignment of error.

## CONCLUSION

**{¶87}** Having overruled all three of Hertzler's assignments of error, we affirm the trial court's judgment entry of conviction.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J.:  Concur in Judgment and Opinion.


                                        For the Court,


                        BY: _____
                                Kristy S. Wilkin, Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**